Martha CARMONA, Donna Foggie, and Roberta Fowler, Petitioners,

v.

Benjamin WARD, Commissioner of the New York State Department of Correctional Services, Frances Clement, Superintendent, Bedford Hills Correctional Facility, Bedford Hills, New York, Edward Hammock, Chairman of the New York State Board of Parole, and the New York State Board of Parole, Respondents.

No. 75 Civ. 6219.

United States District Court, S. D. New York.

Aug. 4, 1977.

1154

See also, D.C., 416 F.Supp. 272.

Legal Action Center of the City of New York, Inc. by Elizabeth Bartholet, Risa G. Dickstein, Mark C. Morril, New York City, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel by Arthur L. Liman, New York City, Michael C. Meltsner, New York City, of counsel; Goldman & Hafetz by Frederick P. Hafetz, New York City, for petitioners Carmona and Foggie.

Washington Square Legal Services, Inc. by E. Judson Jennings, Charles D. Terry, Peter Bickerman, Law Clerk, New York City, for petitioner Fowler.

Louis J. Lefkowitz, Atty. Gen., State of New York by Gerald J. Ryan, Asst. Atty. Gen., New York City, for respondents.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

This is a habeas corpus proceeding brought by three women [1] challenging the constitutionality of their confinement pursuant to judgments of conviction in the New York courts. Specifically, they attack, root and branch, the constitutionality of certain sections of the New York Penal Law, Criminal Procedure Law, and Correction Law, as amended in 1973,[2] which govern the treatment of class A felony drug offenders, and pursuant to which they have been sentenced. The court finds it unnecessary, for reasons set forth *infra*, to discuss all the arguments which they raise. The court holds that Ms. Carmona's and Ms. Fowler's sentences are so disproportionately severe in relation to the gravity of the offenses charged as to constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. However, the court finds no constitutional infirmity in Ms. Foggie's conviction and sentence.

## THE PETITIONERS

Petitioner Martha Carmona is presently serving a sentence of six years to life imprisonment for the crime of criminal possession of a controlled substance in the second degree, to wit, possession of more than one ounce of cocaine, an A–II felony under the 1973 drug law.[3] The sentence is the minimum possible under the law.[4]

1. The original petitioners were Martha Carmona and Donna Foggie, who instituted the action with the intention of having it certified as a class action. Before they moved for class certification, three other state prisoners sought to intervene in the case. Petitioners did not object to the intervention and, in fact, indicated that, if intervention were permitted, they would not press for class certification. (February 5, 1976 transcript at 29.) By opinion dated April 16, 1976 (416 F.Supp. 276), the court allowed Roberta Fowler to intervene, but denied Larry C. Mosley and Doris McNair such permission. The original petitioners did not thereafter press their request for class certification.

2. The relevant sections will be discussed more fully *infra* and are hereinafter collectively referred to as the "1973 drug law".

3. Penal Law § 220.18: "A person is guilty of criminal possession of a controlled substance in the second degree when he knowingly and unlawfully possesses: (1) one or more preparations, compounds, mixtures or substances of an aggregate weight of one ounce or more containing a narcotic drug . . ..
"Criminal possession of a controlled substance in the second degree is a class A–II felony." Cocaine and heroin, among many others, are classified as "narcotic drugs." Penal Law § 220.00(7); Public Health Law § 3306.

4. Penal Law §§ 70.00(1), (2)(a), (3)(a)(ii).

Ms. Carmona is a forty-one year old woman who, though born in Puerto Rico, has lived in New York City since early childhood. As a child, she was given by her married parents to an aunt, who emigrated to New York and raised her in that city. In 1953, she dropped out of high school, assertedly in order to earn money to send to her parents in Puerto Rico. After dropping out of school, she had worked from 1960 to 1973 as a sewing machine operator for a garment manufacturer, and from 1973 until her arrest in 1974, she worked part time for a beauty salon in Manhattan. Though presently unmarried (she was married at age 18 and divorced a year later), she has a daughter approximately twenty-one years old whom she was supporting until her arrest on the instant charges in 1974. The daughter subsequently had to resort to public assistance.

Prior to the events which gave rise to the instant charges, Ms. Carmona had never been convicted of a crime and had only once been arrested—in 1956—when a dispute with a neighbor resulted in the arrest of all parties on assault charges which were ultimately dismissed.

In 1974, Ms. Carmona was arrested on a series of drug-related charges although she herself was not an addict. In May, she was indicted on federal charges of conspiracy and two substantive counts of possession of cocaine with intent to distribute it. The charges were ultimately satisfied by a guilty plea to one substantive count. On August 13, 1974, Ms. Carmona was indicted by a state grand jury in Bronx County on charges based upon the results of a search of her apartment conducted on July 30, 1974. The indictment charged her with violation of several penal statutes due to her alleged possession of items of drug paraphernalia, a small quantity of marijuana, and 3 and ⅜ ounces of cocaine, the latter offense (criminal possession of a controlled substance in the first degree) constituting an A–I felony in New York [5] with a mandatory sentence of at least fifteen years to life.[6] At the time of her arrest, she made a recorded statement to the Assistant District Attorney in charge of the case admitting possession of the cocaine which she had been given by another man on consignment for future sale. Ms. Carmona had earlier in 1974 been charged in two state indictments which, together, alleged that she had sold some 7 and ⅞ ounces of heroin to undercover agents.

On several occasions after her arrest, Ms. Carmona indicated to police and prosecutorial officials that she wished to cooperate with them by supplying information and thereby becoming eligible for the District Attorney's recommendation that she be placed on lifetime probation, rather than facing the harsh penalties attendant to the offenses for which she was charged.[7] However, all the information which she provided the authorities was already known to them and, therefore, of little utility. When she was asked to introduce an undercover agent to her source of narcotic supply, she declined to do so on the ground that she feared for the physical safety of herself and her daughter. Because of her failure to provide any material assistance to the District Attorney's office, Ms. Carmona was not considered an appropriate subject for the probation recommendation. In consequence, after consultation with retained counsel, she accepted an offer to plead guilty to the A–II charge of possession of a controlled substance (cocaine) in the second degree, in satisfaction of all the outstanding charges against her. On January 31, 1975, her plea was accepted by Justice Joseph

---

5. Penal Law § 220.21: "A person is guilty of criminal possession of a controlled substance in the first degree when he knowingly and unlawfully possesses: (1) one or more preparations, compounds, mixtures or substances of an aggregate weight of two ounces or more containing a narcotic drug . . . .

"Criminal possession of a controlled substance in the first degree is a class A–I felony."

6. Penal Law §§ 70.00(1), (2)(a), (3)(a)(i).

7. Penal Law §§ 65.00(1)(b), (3)(a)(ii). Such a recommendation is only possible in the case of an A–III felony, so the District Attorney would first have to agree to a plea to a reduced charge of an A–III felony.

Cohen of the Supreme Court, Bronx County and, on March 10, 1975, she was sentenced to the term of imprisonment previously set forth. Her appeal was denied by the Appellate Division, First Department in late 1976, and leave to appeal to the New York Court of Appeals was denied. She is presently incarcerated in the Bedford Hills Correctional Facility, of which respondent Frances Clement is Superintendent.

Petitioner Donna Foggie is presently on mandatory lifetime parole,[8] having been discharged from incarceration after serving roughly one year of a one year to life sentence for the crime of criminal possession of a controlled substance in the third degree, to wit, sale of 18 grains ($40.00 worth) of cocaine, an A–III felony under the 1973 drug law.[9] The sentence is the minimum possible under the law.[10]

Ms. Foggie is a twenty-five year old woman born and raised in New York City. After her parents separated when she was three years old, she was raised by her mother, with whom she maintains a close relationship. She also remains close to her brother, who is a Sergeant in the Air Force. She dropped out of high school in Brooklyn during her tenth grade, and soon thereafter was married in 1969. Although she was separated from her husband in 1970, she retained custody of their child, a son who is now about eight years old. After leaving high school she held a number of jobs for short periods of time. However, from 1970 until the time of her arrest, she was receiving public assistance.

Ms. Foggie first became a heroin addict at the age of 15, and used heroin intermittently subsequent to that time. On August 20, 1970, she voluntarily committed herself to a drug treatment program at the Drug Abuse Service Bushwick Center in Brooklyn. She was discharged from the program

on July 24, 1974, having reported regularly while on after-care treatment and having made a "satisfactory adjustment". After her discharge from the program, she continued her rehabilitation therapy in two other methadone programs.

Prior to 1974, Ms. Foggie had never been convicted of a criminal offense. In February of 1970, she had been arrested and charged with possession of a dangerous drug in the sixth degree and petit larceny; however, those charges were dismissed in Kings County Criminal Court in 1971.

On August 8, 1974, Ms. Foggie was arrested. An indictment was filed on August 16, 1974 charging her with two counts of criminal sale of a controlled substance in the third degree, two counts of possession of a controlled substance in the third degree, and two counts of possession of a controlled substance in the seventh degree. The charges arose from two separate events: a sale of $50 worth of a substance containing cocaine on or about May 8, 1974, and a sale of $40 worth (18 grains) of a substance containing cocaine on or about May 17, 1974, on each occasion to an undercover agent. The charges resulting from the May 8, 1974 transaction were dismissed by the court upon the prosecutor's refusal to produce the informant who introduced Ms. Foggie to the undercover officer to whom she allegedly made the sale. After a jury trial before Justice Eugene R. Canudo of Supreme Court, Kings County, she was convicted on one count of the indictment, which charged her with the sale occurring on May 17, 1974. On April 28, 1975, she was sentenced to a term of one year to life by Judge Canudo, who indicated that his sentence, the most lenient permitted by the 1973 drug law, was in accordance with both the contents of the probation report and the recommendation of the Assistant District

---

**8.** Until the law was amended during the pendency of this action (see note 22 *infra*), persons convicted of class A drug related offenses could never be discharged from parole. N.Y. Correction Law § 212(8). In this disability, they stood alone among those convicted of criminal offenses in New York.

**9.** Penal Law § 220.39: "A person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells: (1) a narcotic drug . . . . .

"Criminal sale of a controlled substance in the third degree is a class A–III felony."

**10.** Penal Law §§ 70.00(1), (2)(a), (3)(a)(iii).

Attorney in charge of the case. Her appeal, alleging a number of trial errors, was denied by the Appellate Division, Second Department, on June 3, 1977, some time after she had already been released on lifetime parole.

Petitioner-intervenor Roberta Fowler is presently serving a sentence of four years to life imprisonment in Bedford Hills Correctional Facility for the crime of criminal sale of a controlled substance in the third degree,[11] to wit, approximately one individual dose of a substance containing cocaine.

Ms. Fowler, now approximately twenty-three years old, had spent her entire life prior to her arrest in Albany and Sidney Center, New York. Her mother died while she was a teenager, and she received psychiatric counseling for some time thereafter. She completed eleven years of school and, while in prison, has since taken the high school equivalency examination. She has, for varying periods of time, been employed by the New York State Department of Labor, the Eden Park Nursing Home, and the New York Telephone Company. In 1969, she was married to Billie Fowler, and she now has two children who, during her incarceration, reside with her father in Albany. Since her imprisonment for the instant offense, she has apparently made diligent efforts to maintain close contact with her children. On her initiative, both nuns and guidance counselors from the day care center which her children attend have come to Bedford Hills to discuss the children's progress with her. The children have visited her relatively frequently.

The offense for which Ms. Fowler is incarcerated occurred on September 25, 1973. At trial, the Government established that, on that date, one James Werthmuller, an undercover agent, observed the petitioner at an Albany police station, asked her whether she could get him twenty dollars worth of cocaine, and then gave her twenty dollars. Ms. Fowler then left in a car with one Jerome Powell, a Government informer. Some twenty minutes later, the three individuals met again by pre-arrangement at a different location, at which point petitioner handed the substance containing cocaine to Powell, who, in turn, handed it to Werthmuller.

After a jury trial[12] in February, 1974, Ms. Fowler was sentenced, on February 21, 1974, to a term of four years to life, the court exercising its discretion to set a minimum term of from one year to eight years and four months. At the time of sentence, Ms. Fowler, then twenty years of age, had no previous record of violent behavior or of criminal possession or sale of narcotics, although she was not a stranger to the criminal justice system.[13] During 1972, she had sought and obtained treatment at a methadone clinic in Albany, but, at the time of her arrest, she was not addicted to any narcotic drug. Her conviction was appealed through the State court system, and was

---

11. See note 9, *supra*.

12. In her original petition for a writ of habeas corpus, Ms. Fowler alleged in conclusory fashion several trial errors in addition to the constitutional claims advanced also by her co-petitioners. However, in view of the fact that she had adduced no evidence or legal argument whatsoever to substantiate those claims, they have apparently been abandoned.

13. On April 27, 1972, Ms. Fowler was arrested and charged with criminal possession of a hypodermic instrument (Penal Law § 220.45) and criminal use of drug paraphernalia in the second degree (Penal Law § 220.50). She was adjudged guilty of both charges and sentenced to three years probation. On June 29, 1972, she was arrested and charged with prostitution (Penal Law § 230.00). She was found guilty on August 9, 1972, and was sentenced to one year's probation. On February 22, 1973, she was again arrested, charged with prostitution, and found guilty on July 30, 1973. On July 10, 1973, she was arrested and charged with obstructing government administration (Penal Law § 195.05), possession of a dangerous drug (Penal Law § 220.05) [now repealed], and possession of stolen property (Penal Law § 165.-45). These charges were dismissed because she pleaded guilty to another charge on July 30, 1973. On July 12, 1973, she was arrested and charged with petit larceny (Penal Law § 155.25), criminal possession of stolen property in the third degree (Penal Law § 165.40), and possession of a forged instrument in the second degree (Penal Law § 170.25). On July 30, 1973, she was convicted of petit larceny and conditionally discharged on three years probation.

affirmed by the New York Court of Appeals *sub nom., People v. Broadie*, 37 N.Y.2d 100, 371 N.Y.S.2d 471, 332 N.E.2d 338, *cert. denied*, 423 U.S. 950, 96 S.Ct. 372, 46 L.Ed.2d 287 (1975).

## EXHAUSTION OF STATE REMEDIES

■ The State argues at the outset that the claims raised by these petitioners have not been adequately presented to the New York courts to satisfy the exhaustion requirement embodied in 28 U.S.C. § 2254(b). *Picard v. Connor*, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1972). At least with regard to the grounds upon which it rests its decision, the court does not find this argument well taken.

The court here holds that, as applied to Ms. Carmona and Ms. Fowler and their offenses, certain provisions of the 1973 drug law are so disproportionately severe as to constitute cruel and unusual punishment. It is clear that the New York Court of Appeals, in upholding the constitutionality of the 1973 drug law, considered challenges to its validity under the Cruel and Unusual Punishments Clauses of both the New York and United States Constitutions. *Broadie, supra*, 371 N.Y.S.2d at 474, 332 N.E.2d at 341. While the Court did not deal in depth with the personal backgrounds of the appellants or with the specific circumstances of the offenses there charged, a fair reading of the Court's opinion indicates that the Court of Appeals rejected the argument that the statutory punishments were constitutionally defective, either on their face or as applied. *See especially Broadie, supra*, at 475, 477, 482, 332 N.E.2d at 341, 342, 346.

Chief Judge Breitel took pains to note that the Court's opinion did not imply that "in some rare case on its particular facts it may not be found that the statutes have been unconstitutionally applied". *Broadie*

at 482, 332 N.E.2d at 347. However, his citation to Justice Powell's dissenting opinion in *Furman v. Georgia*, 408 U.S. 238, 460–1, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) seems to make clear that the exception, in which application might be unconstitutional, contemplated circumstances in which the alleged crime "technically (fell) within the legislatively defined class but factually (fell) outside the likely legislative intent in creating the category." 408 U.S. at 461, 92 S.Ct. at 2840. The Court was concerned with the possible "accidental offender", not with a situation in which application of the statutory penalties to an offense concededly falling within the statutory definition merely created a disproportionately severe punishment.[14] Accordingly, it seems clear that *Broadie* rejected the argument that the 1973 drug law provisions constituted cruel and unusual punishment, both by their terms and as applied to factual patterns clearly encompassed by the Legislature's intent. It is also clear that the *Broadie* court rejected the Equal Protection challenge as well. 371 N.Y.S.2d at 475, 332 N.E.2d at 341.

Since Ms. Fowler's conviction was one of the cases affirmed by the *Broadie* opinion, it is obvious that she has exhausted her available state remedies. Moreover, since it also seems clear that it would be completely futile for either Ms. Carmona or Ms. Foggie to pursue the same claims on direct appeal in the state courts, they need not do so before seeking relief in this court.[15] *United States ex rel. Sero v. Preiser*, 506 F.2d 1115, 1130 (2d Cir. 1974), *cert. denied*, 421 U.S. 921, 95 S.Ct. 1587, 43 L.Ed.2d 789 (1975).

The State apparently concedes the futility of raising any further constitutional claims in the state courts, insofar as they challenge the statutes' provisions on their face.[16] However, to the extent that petitioners seek in this court, through an evi-

---

14. *Cf. People v. Jones*, 39 N.Y.2d 694, 385 N.Y.S.2d 525, 527–9, 350 N.E.2d 913, 915–917 (1976) (Breitel, C. J., dissenting).

15. It is worthy of note that the memorandum opinion of the Appellate Division, Second Department, 395 N.Y.S.2d 68 affirming Ms. Foggie's conviction noted that "[h]er contention

that the sentencing provisions of the narcotics statutes are unconstitutional as applied to her is without merit", *citing Broadie.*

16. See transcript of February 5, 1976 hearing, at p. 7.

dentiary hearing, to provide a factual predicate for this assertions that the law is arbitrary and ineffective in its impact, the State asserts that the New York courts should have the opportunity to pass upon such claims in the first instance, with the benefit of the evidentiary showing sought to be made here.

While appeals to principles of comity and federalism always have a persuasive ring in the context of federal habeas corpus proceedings, the court is not persuaded that further presentations to the New York courts ought to be required in this situation. This is not a case such as *Needel v. Scafati*, 412 F.2d 761 (1st Cir.), *cert. denied*, 396 U.S. 861, 90 S.Ct. 133, 24 L.Ed.2d 113 (1969), in which critical factual evidence going to the merits of a federal claim was presented for the first time to the federal court, and the state court had no opportunity to consider it. In that case and others, *e.g., United States ex rel. Cleveland v. Casscles*, 479 F.2d 15 (2d Cir. 1973), the additional evidence adduced in the federal court was so significant as to essentially transform the nature of the claim originally presented in the state courts. Understandably, federal appellate courts have felt constrained in such situations to conclude that the state courts had not theretofore had a fair opportunity to consider the outlines of the ultimate federal claim. *Picard v. Connor, supra*.

■ However, this is a different type of case. It is not essentially a factual case, but a legal one. Indeed, the need for the factual hearing is so limited that petitioners have indicated their willingness to *waive* the hearing request if the court decided that the nature of the evidence to be adduced created an exhaustion problem.[17] Petitioners do not seek to bring to this court's attention new facts relating to the crimes which they allegedly committed, nor do they raise new claims relative to their personal situations or any alleged disparity between the magnitude of their offenses and the severity of the punishment. Instead, they seek to adduce some limited factual material, most of which is not disputed by the State and much of which is, in fact, obtained through State agencies and State officials, which would cast doubt upon some of the factual assumptions which the New York Court of Appeals relied upon in upholding the drug law against constitutional challenge. *See, e.g., Broadie, supra*, 371 N.Y.S.2d at 476–9, 332 N.E.2d at 342–344.

In seeking to make this modest evidentiary showing concerning the operation of the law "in practice", petitioners ask no more than has been permitted in other federal habeas corpus cases without a requirement of further exhaustion. *See Humphrey v. Cady*, 405 U.S. 504, 508–512, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972); *United States ex rel. Sero v. Preiser*, 372 F.Supp. 663, 670 (S.D.N.Y.1974); *Ford v. Hollowell*, 385 F.Supp. 1392, 1397 (N.D.Miss.1974). In this case, it seems clear that the legal issues sought to be raised are substantially the same as those raised before and considered by the New York Court of Appeals in *Broadie*. The limited factual presentation provided in this court as support for those claims does not so alter them as to require that the New York courts now be permitted to consider them afresh.[18] *See Developments in the Law—Federal Habeas Corpus*, 83 Harv. L.Rev. 1038, 1096 (1970).

### THE MERITS

Petitioners have attacked the 1973 drug law in numerous respects, notably (1) the mandatory indeterminate life sentences for all class A drug offenders;[19] (2) the preclusion of plea bargaining for A–III felony

---

**17.** Petitioners' Reply Memorandum at pp. 12–13.

**18.** *See also Rowe v. Peyton*, 383 F.2d 709, 711–12 (4th Cir. 1967), *aff'd*, 391 U.S. 54, 88 S.Ct. 1549, 20 L.Ed.2d 420 (1968).

**19.** Penal Law § 70.00.

offenders (which has been eliminated during the pendency of this action);[20] (3) the mandatory lifetime parole provision without possibility of discharge[21] (which has also been altered during the pendency of this action to permit class A drug felons to be discharged from parole on the same basis as all other parolees);[22] (4) the predication of probation, in part, upon a recommendation from the prosecutor due to the defendant's cooperation;[23] and (5) the denial of bail pending appeal.[24] Moreover, they have charged that, both on their face and also as enforced, these various provisions deny them their rights to due process of law, to the equal protection of the law, and to be free from cruel and unusual punishment.

The court does not find it either necessary or appropriate to pass upon all these ably presented challenges to the legality of petitioners' custody. For reasons discussed more fully *infra*, the court holds that the life sentences imposed upon Ms. Carmona and Ms. Fowler are so disproportionately severe in relation to the gravity of their offenses as to violate the Eighth and Fourteenth Amendments. The challenges to the lifetime parole provisions have obviously been rendered moot by the new legislation making these petitioners eligible for discharge from parole like any other parolees. Since the challenge to the preclusion of bail pending appeal was apparently not before the New York Court of Appeals in the *Broadie* case, and since there apparently yet remained an avenue to challenge that statutory provision in the New York courts, the court has already ruled that, in Ms. Foggie's case, the validity of that provision was not ripe for adjudication in the federal courts. *United States ex rel. Carmona v. Ward*, 416

F.Supp. 272 (S.D.N.Y.1976). Since there are now no pending state appeals by these petitioners, it would appear that none of them have standing to challenge that provision.

The remaining provisions concerning plea bargaining and probation are discussed in the context of Ms. Foggie's case. As indicated *infra*, the court does not consider that either of these provisions offend the constitution, either considered singly or in conjunction with the others. Thus, Ms. Foggie's conviction and sentence should not be disturbed.

## THE EIGHTH AMENDMENT CLAIM

■ It is, at this point in our constitutional jurisprudence, a truism to note that the power to define crimes and to establish punishments therefor rests with the legislature in the first instance. *Pennsylvania v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 82 L.Ed. 43 (1937); *Weems v. United States*, 217 U.S. 349, 379, 30 S.Ct. 544, 54 L.Ed. 793 (1910). However, the exercise of that power is subject to judicial scrutiny to ensure that it does not transgress any constitutional prohibitions. The final judgment as to whether the punishment it decrees exceeds constitutional limits is a function reserved to the judiciary. *Furman, supra*, 408 U.S. at 269, 92 S.Ct. 2726 (Brennan, J., concurring); *Trop v. Dulles*, 356 U.S. 86, 103–4, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (plurality opinion of Warren, C. J.). The task of the courts is not, of course, merely to pass judgment upon the wisdom of penal legislation, but rather to determine whether, upon accepted principles, it offends constitutional commands, *Trop, supra*, at 103, 78 S.Ct. 590.

---

**20.** Criminal Procedure Law § 220.10(5)(b) now, effective July 1, 1976, permits a defendant accused of an A–III felony, or an attempt to commit such a felony, to plead guilty to a lesser offense, down to a class C felony. .Section 220.10(6) had previously prevented those accused of A–III felonies from pleading guilty to a reduced charge.

**21.** Correction Law §§ 212(6) and (8).

**22.** The Governor's bill, S.6912, has been passed by both Houses of the New York Legislature. It was placed on the Governor's desk for his signature on August 2, 1977. This opinion is written on the assumption that the Governor will sign the bill.

**23.** Penal Law § 65.00(1)(b).

**24.** Criminal Procedure Law § 530.50.

The Cruel and Unusual Punishments Clause of the Eighth Amendment,[25] however, infrequently invoked by the Supreme Court, has served as an important—and controversial—check upon the legislature's power to define and punish crimes. In appropriate cases, the Supreme Court has not hesitated to rely upon that clause in declaring the imposition of a particular punishment constitutionally impermissible. *See e. g., Coker v. Georgia,* —— U.S. ——, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); *Furman, supra; Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); *Trop, supra; Weems, supra.* Nor, of course, has the United States Supreme Court been alone in relying upon that clause, or comparable provisions in state constitutions, to protect the right of individual defendants to be free of unduly harsh, oppressive, or arbitrary punishments decreed by a majoritarian political system. *See, e. g., Hart v. Coiner,* 483 F.2d 136, 140 (4th Cir. 1973), *cert. denied,* 415 U.S. 983, 94 S.Ct. 1577, 39 L.Ed.2d 881 (1974); *Ralph v. Warden,* 438 F.2d 786 (4th Cir. 1970), *cert. denied,* 408 U.S. 942, 92 S.Ct. 2846, 33 L.Ed.2d 766 (1972); *In re Foss,* 10 Cal.3d 910, 112 Cal. Rptr. 649, 519 P.2d 1073 (1974); *In re Lynch,* 8 Cal.3d 410, 105 Cal.Rptr. 217, 503 P.2d 921 (1972); *Workman v. Commonwealth,* 429 S.W.2d 374, 377 (Ky.1968) and cases cited therein.

■ It is, furthermore, clear that a punishment may be constitutionally impermissible under the Eighth Amendment not only because of its nature or mode, but also because of its severity or harshness. A punishment, otherwise appropriate, may be so disproportionate to the offense charged and the circumstances of the case that it may violate the Constitution. "To be sure, imprisonment for ninety days is not, in the abstract, a punishment which is either cruel or unusual. But the question cannot be considered in the abstract. Even one day in prison would be cruel and unusual punishment for the 'crime' of having a common cold." *Robinson, supra,* 370 U.S. at 667, 82 S.Ct. at 1421. *Accord, Ralph, supra,* at 789–90 (citing cases); *In re Lynch, supra,* 105 Cal.Rptr. at 223, 503 P.2d at 927 *et seq.* (citing cases). While the United States Supreme Court has never held a sentence of imprisonment invalid under the Eighth Amendment solely because of its length,[26] *Downey v. Perini,* 518 F.2d 1288, 1290 (6th Cir.) *vacated and remanded,* 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975), state courts and other federal courts have not been so reluctant. *See Ralph, supra; Hart, supra; United States v. McKinney,* 427 F.2d 449, 455 (6th Cir. 1970), *cert. denied,* 402 U.S. 982, 91 S.Ct. 1648, 29 L.Ed.2d 148 (1971); *In re Lynch, supra.* And there is obviously nothing in the Eighth Amendment standards enunciated by the Supreme Court which, in terms, prevents their application to periods of imprisonment alone.

Application of either the concept of disproportionality or the more nebulous Eighth Amendment test of whether a challenged punishment comports with the "dignity of man", "[t]he basic concept underlying the Eighth Amendment", *Trop, supra,* 356 U.S. at 100, 78 S.Ct. at 597, obviously presents difficulties of interpretation upon which reasonable persons can and do differ. However, recent cases in the Supreme Court have provided sufficient guidance that this court's decision is somewhat facilitated.

■ Clearly, the application of such general and value-laden principles calls for the utmost in judicial self-restraint consistent with the conscientious discharge of the court's constitutional responsibilities. While the Eighth Amendment is an evolving concept "draw[ing] its meaning from the evolving standards of decency that mark the progress of a maturing society",

---

**25.** The Cruel and Unusual Punishments Clause of the Eighth Amendment is fully applicable to the States through the Due Process Clause of the Fourteenth Amendment. *Furman, supra,* 408 U.S. at 257 n. 1, 92 S.Ct. 2726; *Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

**26.** The Supreme Court did entertain and reject such a challenge as early as *Howard v. Fleming,* 191 U.S. 126, 24 S.Ct. 49, 48 L.Ed. 121 (1903), however.

*Trop, supra,* at 101, 78 S.Ct. at 598, the Supreme Court has made clear that the process of divining such contemporary standards does not give federal judges license to apply to challenged punishments their own subjective perceptions of proper penology. *Furman, supra,* 408 U.S. at 277–8, n. 21, 92 S.Ct. 2726 (Brennan, J., concurring). Insofar as possible, the constitutional propriety of a challenged punishment is to be judged by "objective indicia" rather than by subjective judicial reaction. *Gregg v. Georgia,* 428 U.S. 153, 172, 96 S.Ct. 2909, 2924, 49 L.Ed.2d 859, 874 (1976) (opinion of Stewart, J.);[27] *Coker, supra,* —— U.S. at ——, .97 S.Ct. 2861.

The Court's recent decision in *Coker* reaffirmed its previous holding in *Gregg* that "a punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground." —— U.S. at ——, 97 S.Ct. at 2865. In the instant case, this court holds that the punishments inflicted upon petitioners Carmona and Fowler are unconstitutional on the latter ground.[28]

**27.** It bears noting that, in eschewing reliance on subjective perceptions by the judiciary, the Supreme Court has enunciated a standard which, at least in emphasis, seems to impose somewhat more judicial restraint than formulations set forth in the construction of some comparable state constitutional provisions. *See, e. g., In re Lynch, supra,* 105 Cal.Rptr. at 226, 503 P.2d at 930 ("shocks the conscience"); *Workman, supra,* at 378 ("shocks the general conscience").

**28.** While the court holds that the punishment of life imprisonment imposed upon Ms. Carmona and Ms. Fowler is invalid on the ground of disproportionality, the court was also presented with considerable evidence bearing on the alternative test, *i. e.,* whether the drug law makes any "measurable contribution to acceptable goals of punishment". Although the court does not rest its holding on this ground, it is worth noting that, insofar as it is possible to gauge the "success" of a penal law, the 1973 drug law's record has been mixed at best.

The State does not argue that, by any reading of these statutes, they were intended to rehabilitate drug offenders. Indeed, the New York Court of Appeals found that the purposes of these enactments were isolation and deterrence of drug offenders. *Broadie, supra,* 371 N.Y. S.2d at 478, 332 N.E.2d at 343. While retribution is not a constitutionally impermissible goal of penal legislation, *Gregg, supra,* 428 U.S. at 182, 96 S.Ct. at 2929, 49 L.Ed.2d at 880, it is not the objective of the laws at issue in this case, nor, arguably, is it a goal of any penal legislation in New York. *See N.Y. Penal Law* § 1.05(5). Thus, the effectiveness of this legislation should be judged in relation to the goals for which it was enacted.

While it is virtually impossible to gauge with any precision the deterrent effectiveness of a given penal sanction, there are reasons to question whether the 1973 drug laws have proved to be an effective deterrent to drug-related offenses.

In the first place, at least through the end of 1975 (and prior to relaxation of the restrictions on plea bargaining by A–III offenders), the speed with which cases are processed did not improve, and whatever correlation exists between speed of punishment and deterrence of crime was not realized. As discussed *infra,* the fact that persons accused of A–III offenses could not plead guilty to any less serious crimes led to a substantial increase in the demand for trials of A–III indictments, since A–III offenders stood to "lose" nothing by taking their chances before a jury. This increase in trials caused a backlog of untried cases, particularly in New York City, and increased the time required to obtain dispositions of drug charges. Additionally, this backlog of A–III cases to be tried increased the pressure on prosecutors to allow arguably more serious offenders, *i. e.,* those accused of A–I and A–II drug offenses, to plead guilty to A–III charges, with their lower minimum sentences. Indeed, it was pressure from state prosecutors which, at least in part, led to the 1976 amendments permitting those charged with A–III offenses to plead guilty to lesser offenses, thereby relieving the logjam.

Secondly, at least in the admittedly "transitional" period of 1973 through 1975, there is some evidence that the number of drug offenders sentenced to prison in New York actually *declined.* In 1975, both the number of dispositions and also the number of prison sentences imposed for *all* drug offenses in New York State (not just class A felonies) were *less* than the comparable figures for 1973. This anomaly was due primarily to the backlogs in the New York City courts occasioned by the increasing number of defendants who were choosing to go to trial. However, the figures for 1975 were higher than the figures for 1974. Moreover, the percentage of those convicted who actually

■ The court considers first the punishments of imprisonment imposed upon Ms. Carmona and Ms. Fowler, who are incarcerated for indeterminate terms of six years to life and four years to life, respectively. Although it is entirely possible, and indeed probable, that they will both be released from prison substantially before the expiration of their maximum term, they have no *right* to release at an earlier time, *Menechino v. Oswald*, 430 F.2d 403, 408 (2d Cir. 1970), *cert. denied*, 400 U.S. 1023, 91 S.Ct. 588, 27 L.Ed.2d 635 (1971), and their release is within the Parole Board's discretion. Accordingly, for Eighth Amendment purposes, the court must judge the severity of their punishments by looking to the maximum term possible under the judgment of the sentencing court—in this case, life imprisonment. *Broadie, supra*, 371 N.Y.S.2d at 475, 332 N.E.2d at 341; *In re Lynch, supra*, 105 Cal.Rptr. at 220–222, 503 P.2d at 924–6.[29]

Thus, the precise question before the court is whether the State of New York may constitutionally punish either the sale of one individual dose of cocaine (in Mrs. Fowler's case) or possession of 3 and ⅜ ounces of cocaine (in Ms. Carmona's case) by life imprisonment.

The principle of proportionality of punishment to the offense is well settled under the Eighth Amendment. *Weems, supra*. And there are several objective indicia to which the court may turn in determining whether the punishment provided by the Legislature is so grossly disproportionate to the nature of the offense as to offend contemporary standards of decency.

■ Although by no means dispositive of a punishment's constitutionality, *Gregg, supra*, 428 U.S. at 174, 96 S.Ct. at 2925, 49 L.Ed.2d at 875, n. 19, the enactments of legislative bodies, both in New York and elsewhere, serve as some index of community standards and values.[30] *Coker, supra*,

received prison sentences increased substantially, from 32.9% in 1973 to 46.3% in 1975. (The figures are as low as they are for two reasons: they include some drug crimes, other than class A felonies, which do not carry mandatory prison sentences; and they include some other cases, brought under the less severe predecessor statutes, which do not carry mandatory sentences.) Finally, the percentage of those first offenders accused of class A felonies who received prison sentences increased from about 10% to about 90%. (Prior to the 1976 amendments, persons indicted for class A drug felonies could escape the mandatory life time sentences only by being acquitted, by being adjudicated youthful offenders, or by qualifying for a prosecutor's recommendation of lifetime probation in exchange for cooperation.)

There was also evidence in this case that the prospect of mandatory life sentences and mandatory minimum terms had substantially increased the willingness of indicted drug dealers to cooperate with both federal and state authorities. There is, however, no necessary correlation between the willingness of defendants, already charged, to cooperate with the authorities, and the perceptions of drug users or dealers still undetected and at liberty.

In sum, while the speed of dispositions decreased and the absolute number of dispositions and sentences also decreased (at least temporarily) the risk of receiving a prison sentence after conviction increased substantially under the 1973 drug law. This court obviously cannot and need not determine whether these phenomena *will* substantially increase the deterrent effect of New York's drug laws.

**29.** *Cf. Trop, supra*, 356 U.S. at 102, 78 S.Ct. at 599: "It is no answer to suggest that all the disastrous consequences of this fate may not be brought to bear on a stateless person. The threat makes the punishment obnoxious."

**30.** The rationale for comparing the challenged punishment with punishments for other types of crimes in the same jurisdiction has been stated as follows: "[T]he Legislature may be depended upon to act with due and deliberate regard for constitutional restraints in prescribing the vast majority of punishments set forth in our statutes. The latter may therefore be deemed illustrative of constitutionally permissible degrees of severity; and if among them are found more serious crimes punished less severely than the offense in question, the challenged penalty is to that extent suspect." *In re Lynch, supra*, 105 Cal.Rptr. at 228, 503 P.2d at 932.

The rationale for comparing the punishment in question with punishments for the same crime in other jurisdictions is based upon "the assumption . . . that the vast majority of those jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness." *In re*

—— U.S. at ——–——, 97 S.Ct. 2861; *In re Lynch, supra*, 105 Cal.Rptr. at 231, 503 P.2d at 935 *et seq.*; *Ralph, supra*, at 790–2; *Hart, supra*, at 139. Thus, they give some indication of a punishment's general moral acceptability.

In New York, all class A non-capital felony offenders must receive an indeterminate sentence with a maximum duration of life imprisonment.[31] Thus, class A drug offenders, irrespective of the degree of their involvement in the drug trade, receive the same maximum sentence as those felons convicted of first degree murder,[32] first degree arson,[33] and kidnapping in the first degree.[34] Additionally, class A drug offenders are punished *more* severely than felons convicted of such crimes as second degree arson,[35] first degree rape,[36] first degree manslaughter,[37] first degree burglary,[38] and second degree kidnapping,[39] all of which are classified as B felonies carrying a maximum term of imprisonment of 25[40] years. However, even this comparative picture of the treatment of class A drug offenders fails to convey the relative severity of the treatment which is accorded them, for all other class A offenders may plead guilty to a B felony or less, and thus avoid the mandatory maximum life term; only class A drug offenders were statutorily precluded from this treatment until recent amendments made such a plea possible for A–III offenders.[41] Moreover, only the class A drug felon was to remain, until recently, on parole for the rest of his or her life if ever released from prison.[42]

Not only is the treatment of A felony drug offenders unique in its severity among non-capital crimes in New York, however, but it is also virtually unique among all the States of the Union. The New York Court of Appeals duly noted in the *Broadie* case that "drug trafficking is punished more severely in this State than in other jurisdictions." 371 N.Y.S.2d at 480, 332 N.E.2d at 345. By comparison, in apparently no other state would these petitioners, for these offenses, today be subjected to mandatory life sentences, with limited provisions for plea bargaining, and no possibility of discharge from eventual parole, if any.

At the time of the institution of this action, only two states—California and Louisiana—required the court to impose a life sentence for certain drug offenses. However, effective July 1, 1977, California eliminated the mandatory indeterminate life sentence and substituted definite sentences of up to five years for a first offender, depending on the nature of the offense.[43] The penalty for *sale* of any amount of cocaine, the more serious offense in the instant case, would today be punished by a definite sentence of from three to five years,[44] rather than five years to life as under previous law. Possession with intent to sell is now punished by imprisonment for two, three, or four years.[45] However, even prior to these changes, the California sentencing scheme was significantly different from New York's. In California, the "life sentence" was imposed as part of that

*Lynch, supra*, 105 Cal.Rptr. at 228, 503 P.2d at 932. *See also Weems, supra*, 217 U.S. at 377, 30 S.Ct. 544; *Trop, supra*, 356 U.S. at 102, 78 S.Ct. 590.

**31.** Penal Law § 70.00.

**32.** Penal Law § 125.27.

**33.** Penal Law § 150.20.

**34.** Penal Law § 135.25.

**35.** Penal Law § 150.15.

**36.** Penal Law § 130.35.

**37.** Penal Law § 125.20.

**38.** Penal Law § 140.30.

**39.** Penal Law § 135.20.

**40.** Penal Law § 70.00(2)(b).

**41.** Criminal Procedure Law § 220.10. A–I and A–II offenders must still plead to at least an A–III offense.

**42.** See notes 8 and 22, *supra*.

**43.** Cal. Health and Safety Code §§ 11350, *et seq.*

**44.** Cal. Health and Safety Code § 11352.

**45.** Cal. Health and Safety Code § 11351.

state's indeterminate sentencing program, which accords to the Adult Authority responsibility for setting the actual term; the "life sentence" must be reviewed by the Adult Authority promptly after commitment, and a definite term of years set. *In re Rodriguez*, 14 Cal.3d 639, 122 Cal.Rptr. 552, 537 P.2d 384 (1975). Furthermore, California also previously permitted probation for some narcotic offenders under certain circumstances.[46]

Louisiana still retains a mandatory life sentence for certain narcotic offenses; for instance, sale of heroin.[47] However, the penalty for sale (or possession with intent to sell) of cocaine is a sentence of from five years to thirty years at hard labor, and a fine of up to $15,000.[48] Simple possession, moreover, is punishable by imprisonment, with or without hard labor, for not more than five years[49] and, if the defendant is a first offender, he may be eligible for a conditional discharge.[50] While this punishment scheme is in some respects severe, particularly with its provision for doubling of punishments for second or subsequent offenders,[51] it is still clear that both Ms. Carmona and Ms. Fowler would have received substantially less onerous sentences in either California or Louisiana under present law.

Under federal law, sale or possession with intent to sell cocaine (or, for that matter, heroin and many other narcotic drugs) is punishable as a first offense by probation or imprisonment up to 15 years, a fine of up to $25,000, or both, along with a mandatory special parole term of at least three years[52] following any term of imprisonment. A second offense may be punished by imprisonment up to 30 years, a fine of up to $50,000, and a special parole term of at least six years.[53] Ms. Fowler would have been subject to the former provision under federal law and she might well have received a sentence of probation. Ms. Carmona, who was charged with simple possession of cocaine,[54] could have received no more than one year imprisonment and/or a $5,000 fine under federal law since this was her first conviction for a drug offense.[55] Even if it were a second offense, she could have received no more than two years' imprisonment along with a possible $10,000[56] fine. Moreover, as a first offender, she might have received probation, with a subsequent discharge from supervision and dismissal of the charges without an adjudication of guilt.[57] Even if either petitioner were adjudged to be a "dangerous special drug offender," she could receive a maximum of only 25 years' imprisonment.[58] Only if she were found guilty of engaging in a "continuing criminal enterprise" in concert with at least five others could she receive a term of imprisonment approaching a life sentence.[59]

Even this brief survey is sufficient to make it clear that the penalty imposed upon petitioners Carmona and Fowler is "unusual" in its severity, both when compared with punishments for other offenses within New York, and also when matched against punishments for similar offenses in other

---

46. Cal. Penal Code §§ 1203, 1203.07.

47. L.S.A. § 40:966.

48. L.S.A. § 40:967.

49. L.S.A. § 40:967.

50. L.S.A. § 40:983.

51. L.S.A. § 40:982.

52. 21 U.S.C. § 841(b)(1)(A).

53. 21 U.S.C. § 841(b)(1)(A).

54. The New York Penal Law does not distinguish between possession with intent to sell and simple possession. Ms. Carmona was convicted simply of criminal possession of a controlled substance. Her statement to the District Attorney, however, made clear that she possessed the cocaine with intent to sell it. Therefore, she would probably have been so charged under those circumstances under federal law.

55. 21 U.S.C. § 844(a).

56. 21 U.S.C. § 844(a)

57. 21 U.S.C. § 844(b).

58. 21 U.S.C. § 849.

59. 21 U.S.C. § 848.

jurisdictions. This disparity is powerful evidence that the challenged punishments of life imprisonment do not comport with prevalent moral notions of what constitute just, temperate, and appropriate punishments for these offenses. Thus, this evidence weighs heavily in the scales against the constitutionality of these sentences.

In response to this showing, however, the State makes two arguments.

First, it points out that, within a very broad range of discretion, it is the Legislature's prerogative to determine the relative gravity of offenses within its jurisdiction and to tailor its punishments accordingly. *Pennsylvania v. Ashe, supra*, 302 U.S. at 55, 58 S.Ct. 59. The fact, therefore, that it chooses to penalize certain drug offenses more seriously than other crimes reflects a perfectly legitimate exercise of its constitutional powers.

Secondly, and somewhat more persuasively, it argues that the disparity in treatment of similar offenses between states is perfectly permissible in a federal union in which many jurisdictions are grappling with a narcotics problem of varying degrees of intractability. The State urges that the Eighth Amendment should not be applied in such a way as to discourage innovative solutions to a social and criminal problem which has, to a large degree, defied many disparate corrective approaches.

■ The State's first argument is certainly sound as a general principle, but it proves too much. Although the State clearly has a great deal of latitude in making judgments as to the relative severity of crimes, surely, to use an extreme example, the State would not be free, without any constitutional sanction, to provide a sentence of life imprisonment for a five dollar theft, when it made manslaughter, arson and rape punishable only by a maximum of twenty five years in prison. The judiciary must necessarily have some function in assuring that the chosen punishment scheme

comports with the human dignity of the criminals who are subject to it.

The State's second argument is, at least up to a point, very appealing. There is, surely, room in a federal system for a diversity of penological approaches to a problem as widespread and difficult as that of the illegal drug trade. *Cf. Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974) (narcotic addict rehabilitation); *McGinnis v. Royster*, 410 U.S. 263, 270, 93 S.Ct. 1055, 35 L.Ed.2d 282 (1973) (parole eligibility). Moreover, the concededly vast extent of the drug problem in the State and especially the City of New York has been widely noted,[60] and was certainly paramount in the minds of the concerned legislators who enacted the 1973 drug law in New York.[61] And the State clearly has "broad power" to regulate the narcotic drug traffic within its borders. *Robinson, supra*, 370 U.S. at 664, 82 S.Ct. 1417.

However, there necessarily remains a constitutional limitation upon the State's freedom to undertake even the most enlightened and well motivated approach to the most intractable and corrosive social problems. Whether the Legislature saw fit to hospitalize drug offenders indefinitely to attempt to effect their rehabilitation, or whether it decided to decree their summary execution as the ultimate deterrent, the courts could necessarily be called upon to determine whether such punishments comported with the dictates of the Eighth Amendment. "Judicial enforcement of the [Cruel and Unusual Punishments] Clause . . . cannot be evaded by invoking the obvious truth that legislatures have the power to prescribe punishments for crimes. That is precisely the reason the Clause appears in the Bill of Rights." *Furman, supra*, 408 U.S. at 269, 92 S.Ct. at 2741 (Brennan, J., concurring).

The State argues, as the New York Court of Appeals noted in *Broadie, supra*, 371 N.Y.S.2d at 477, 480, 332 N.E.2d at 343, 345,

---

60. *See, e. g., Broadie, supra*, 371 N.Y.S.2d at 480, 332 N.E.2d at 345.

61. *See, e. g.*, the legislative history cited in *Broadie, supra*, at 481, 332 N.E.2d at 345; *see also 2 McKinney's 1976 Session Laws of New York*, 2317–2322 (Governor's Message).

that narcotic offenses are peculiarly serious crimes in that they not only can lead to serious physiological damage and psychological dependency in the drug user, but they also can generate "collateral" crimes, often violent ones, as addicts are forced to resort to other crimes to support their habits. Therefore, it is argued, the Legislature was justified in imposing severe penalties on all those who play any "roles in the scourge of drug distribution", however peripheral. *Broadie, supra,* at 478, 332 N.E.2d at 343.

■ There are at least two serious problems with this line of reasoning, however. In the first place, it is necessary to judge the proportionality of a punishment with relation to the *actual* offense committed; a penalty cannot be justified solely by the potential for more serious conduct, even though it may be violent and dangerous. For instance, in *Ralph, supra,* the Court of Appeals for the Fourth Circuit invalidated imposition of the death penalty for rape on the ground that, in that case, the rapist had "neither taken nor endangered life," (438 F.2d at 788) despite the fact that the circumstances of that case clearly involved the potential for such violence. Similarly, when the United States Supreme Court subsequently ruled that the death penalty for rape of an adult woman was impermissibly disproportionate to the gravity of the offense it noted that "[a]lthough it may be accompanied by another crime, rape by definition does not include the death or even the serious injury to another person. The murderer kills; the rapist, if no more than that, does not." *Coker, supra,* —— U.S. at ——, 97 S.Ct. at 2869 (footnote omitted). Clearly there are constitutional limits to the extent to which the statistical, or assumed, connection between a particular offense and collateral crimes may be used to justify a particularly harsh penalty for commission of the acts in question.[62]

■ Moreover, the Eighth Amendment requires that a Legislature make some rational gradations of culpability in determining the punishments mandated for criminal offenses. *Ralph, supra,* at 788; *In re Foss,* 10 Cal.3d 910, 112 Cal.Rptr. 649, 655, 519 P.2d 1073, 1079 (1974). *Cf.* N.Y. Penal Law § 1.05(4). In the latter case, the California Supreme Court, interpreting the California constitution, ruled that a statutory provision absolutely precluding parole consideration during the first ten years of a mandatory ten years to life imprisonment sentence was, as applied to the defendant in that case, constitutionally invalid because disproportionate to the offense committed, even though the defendant was convicted of five counts of furnishing heroin and had previously been convicted of heroin possession. In so ruling, the Court noted that "[w]e have no doubt that heroin abuse presents a serious problem to our society or that harsh penalties may be necessary to restrict the supply, sale and distribution of this substance . . . [H]owever, consideration should be given to the particular circumstances of the offenses committed, such as the quantity of narcotics involved, and whether the transactions were those of an addict to support his habit . . . or were sales for profit made by other suppliers of heroin." 112 Cal.Rptr. at 655, 519 P.2d at 1079.

■ To say that the Legislature must make some rational gradations of culpability is by no means to say that, in every instance, mandatory prison sentences are unconstitutional, for that is clearly not the law. *See, e. g., Gallego v. United States,* 276 F.2d 914 (9th Cir. 1960) (five years minimum for importation of marijuana); *United States v. Chow,* 398 F.2d 596 (2d Cir. 1968) (five year minimum for importation of 15 pounds of opium). However, the punishments provided by the State of New York for class A felony drug offenders are quite extraordinary in their failure to differentiate between minor offenders and

---

**62.** It is interesting to note that a widely assumed correlation between the incidence of robberies and assaults and the geographically concentrated practice of prostitution has led, in the main, to calls for stricter enforcement of existing laws against prostitution, rather than for an increase in the penalties for that offense, which is presently a class B misdemeanor. Penal Law § 230.00.

major drug dealers. It is certainly true that different mandatory *minimum* terms of imprisonment are provided for A–I, A–II and A–III offenders, depending principally upon the aggregate amount of narcotic (or substance containing narcotic) involved in the particular offense.[63] However, each A felony offender, regardless of the gravity of his or her offense, is nonetheless subject to a *maximum* term of life imprisonment which, as indicated *supra*,[64] is the punishment to be considered in an Eighth Amendment analysis. Thus, for example, a person, never before involved with the law, who is convicted of agreeing to give [65] *any* amount (up to one-eighth of an ounce) of a narcotic drug to a friend receives the same life sentence as does the major purveyor of heroin. This total failure to tailor the maximum indeterminate sentence in any meaningful way to the culpability of the offender, the gravity of the offense, and the peculiar circumstances of each case also renders the life sentences imposed in this case constitutionally suspect.[66]

It is further argued by the State that the drug law's gradation of minimum terms of imprisonment according to the amount of the substance containing narcotic provides a constitutionally sufficient method of differentiating among various degrees of culpability within the general class of A felony drug offenders. In a case involving a challenge to the predecessor New York statutes, the Court of Appeals for this Circuit upheld

use of the aggregate weight standard to define different crimes, noting that "[t]he State cannot be expected to make gradations and differentiations and draw distinctions and degrees so fine as to treat all law violators with the precision of a computer . . . ." *United States ex rel. Daneff v. Henderson*, 501 F.2d 1180, 1184 (2d Cir. 1974).[67] However, that case, and the difference between minimum terms generally, are simply not relevant to the Eighth Amendment issue for decision. The petitioners are not challenging the concept of the mandatory minimums, *per se*, but rather the maximum life sentences,[68] which are mandatory for all class A felony offenders, and which form the relevant benchmark for Eighth Amendment purposes. And it is unquestioned that that term is applied to all A felony drug offenders, regardless of the amount of narcotic substance involved in their particular cases.

It should be further noted that whatever rationality is imparted to the A felony drug punishment scheme by the differentiation based upon the amount of narcotic-containing substance involved has been substantially vitiated by the operation of the law in practice. And, as Justice Douglas noted in his concurring opinion in *Furman, supra*, "[w]hat may be said of the validity of a law on the books and what may be done with the law in its application do, or may, lead to quite different conclusions." 408 U.S. at 242,[69] 92 S.Ct. at 2728. The proscription

---

**63.** A convicted felon may well not be released from prison at the expiration of the minimum term imposed by the court, however, since the Parole Board retains considerable discretion concerning the actual timing of the release date. Observation has tended to indicate that prisoners *usually* serve more than the minimum term. (Transcript of November 10, 1976 hearing at 147).

**64.** See p. 21, *supra*.

**65.** See note 9, *supra*. " 'Sell' means to sell, exchange, give or dispose of to another, or to offer or agree to do the same." Penal Law § 220.00(1).

**66.** It is true, of course, that portions of the 1973 drug law do differentiate between first offenders and repeat offenders. *See, e. g.*, Penal Law §§ 220.12; 220.34(2); 220.37(2); 220.39(2);

220.55. However, those provisions do nothing to distinguish among class A offenders in terms of imposition of the maximum penalty of life imprisonment.

**67.** That case explicitly declined to pass judgment on the aggregate weight standard in the context of the 1973 drug law, however. 501 F.2d at 1185, n. 6.

**68.** See transcript of November 9, 1976 hearing, at pp. 2–3.

**69.** *Cf. Furman, supra*, at 314, 92 S.Ct. at 2764–2765 (White, J., concurring): "Legislative 'policy' is thus necessarily defined not by what is legislatively authorized but by what juries and judges do in exercising the discretion so regularly conferred upon them." ,

against pleading out of the A felony class, until recently changed by amendment, led to the result that many drug offenders originally charged with A–I and A–II drug offenses were allowed to plead guilty to A–III charges,[70] while those charged with A–III offenses were not allowed to plead to reduced charges.[71] Thus, those persons accused of what were, at least theoretically, the least serious offenses in the A felony category were facing precisely the same penalties as many of those accused of the most serious, i. e., A–I offenses. Moreover, evidence presented to the court indicated that those persons originally charged with A–I and A–II offenses were not receiving sentences any more severe, in terms of the minimums provided, than those who were originally charged with A–III offenses; most received the minimum sentence of one year to life imprisonment.[72] Restrictions on probation further ensured that the category of persons sentenced as A–III felons would encompass not only many serious offenders, but also individuals who might have been under other circumstances, treated as inconsequential offenders and released on probation.

■ To point out these anomalies is by no means to suggest that criminal defendants have a "right" to plead guilty to charges less serious than those which they originally faced. They clearly have no such right. *See Hutcherson v. United States,* 120 U.S.App.D.C. 274, 345 F.2d 964, 967,

*cert. denied,* 382 U.S. 894, 86 S.Ct. 188, 15 L.Ed.2d 151 (1965) ("A defendant has no constitutional right to elect which of two applicable statutes shall be the basis of his indictment and prosecution."). Moreover, petitioners' argument that reducing the discretion of the sentencing judge merely leaves undue discretion in the hands of police making arrests and prosecutors deciding whether to prosecute and on what charges is not pertinent to the Eighth Amendment claim. *Proffitt v. Florida,* 428 U.S. 242, 254, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913, 924 (1976); *Gregg, supra,* 428 U.S. at 198, 96 S.Ct. at 2937, 49 L.Ed.2d at 889.

The point is the somewhat collateral one that, to the extent that the State argues that the differentiation in *minimum* terms of imprisonment takes constitutionally sufficient cognizance of the different gradations of culpability among class A felony drug offenders, that argument is seriously undercut by the way in which the law has operated in practice. In a criminal justice system which is simply not equipped to try all cases as originally charged, the statutory differences among offenses may turn out to be virtually meaningless in practice. However, as indicated previously, the State's provision for different *minimum* sentences for various categories of A felonies does not cure the fact that *all* class A drug offenders, regardless of the gravity of their offenses, receive a mandatory *maximum* sentence of life imprisonment.

---

**70.** The court heard testimony from Anthony F. Japha, Director of the Committee on New York Drug Law Evaluation of the Association of the Bar of the City of New York. As a part of that study, he determined that, in New York City, where a major portion of the State's drug offenses are tried, in 1974 and 1975 some 29% of cases which began as A–I indictments were ultimately disposed of as A–II charges, and 59% of A–I indictments were disposed of as A–III charges. Some 73% of A–II indictments were ultimately disposed of as A–III charges. (November 9, 1976 transcript at 62).

It bears noting that, during those years, approximately 75% of the drug indictments in New York City were for class A felonies, with roughly 35% of those being A–I, 28% being A–II, and 36% being A–III. (Nov. 9 tr. at 61). Statewide, over 50% of all drug indictments were for class A felonies. However, 84% of all

drug *convictions* in the state were for A–III felonies.

**71.** That prosecutors would have, but for the law's restrictions, allowed a substantial number of persons accused of A–III felonies to plead guilty to lesser crimes is indicated by the testimony of Sterling Johnson, Jr., Special Narcotics Prosecutor for the City of New York. (November 10, 1976 transcript at 167). Had she been allowed to plead to a reduced charge, Ms. Foggie would have probably been allowed to plead to a class C felony. (*Id.* at 164–5).

**72.** Paradoxically, in New York City during 1974 and 1975, A–I and A–II felons pleading guilty to A–III charges were slightly *more* likely to receive the minimum one year to life sentence than were defendants originally charged with A–III felonies.

■ To summarize, the court holds that the mandatory sentences of life imprisonment imposed upon Ms. Carmona and Ms. Fowler are so grossly disproportionate to the nature of their offenses as to constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution. These sentences are significantly more severe than those which would have been imposed for the same offenses in any other jurisdiction in the United States, and are more severe than those imposed for many serious and violent crimes in the State of New York itself. The statutory scheme pursuant to which they were imposed does not differentiate, in imposition of this maximum punishment, among offenders of varying degrees of culpability, nor does it allow for consideration of any mitigating circumstances in the case unless the accused persons can provide the prosecutors with sufficient new and material intelligence information that they become eligible for a probation recommendation. Even in view of the admitted severity of the drug abuse problem in New York, this court cannot accept the proposition that the State's legitimate interests in both deterrence and isolation of drug offenders could not be as well served by such sentences of shorter duration as are provided for in other jurisdictions in this nation,[73] including the federal system where many New York City and State drug offenders are regularly tried, convicted, and sentenced.

Finally, as noted by the Court of Appeals for the Fourth Circuit in *Hart, supra,* "Life imprisonment is the penultimate punishment. Tradition, custom, and common sense reserve it for those violent persons who are dangerous to others. It is not a practical solution to petty crime in America. Aside from the proportionality principle, there aren't enough prisons in America to hold all the Harts that afflict us." 483 F.2d at 141. This court does not mean to suggest, of course, that the offenses for which Ms. Carmona and Ms. Fowler were convicted should be characterized as "petty crimes". However, it *is* appropriate to note that these were not crimes of violence, nor were the aggregate amounts of cocaine-containing substance very large in any of the three cases before the court.[74] In light of the amounts of illicit substance involved in the cases of Ms. Carmona and Ms. Fowler, the court has the "abiding conviction"[75] that the life sentences imposed are so disproportionately severe as to be unconstitutional. It is certainly true that both these petitioners had either previous or contemporaneous involvement with the criminal justice system. But just as those charges did not warrant a more severe sentence as a second narcotic offender, they cannot serve to justify the Draconian penalty imposed for the instant offenses.

## DONNA FOGGIE

■ As indicated previously, Ms. Foggie is currently on parole, having been released from prison after serving roughly one year of her one year to life sentence. Necessarily, her situation presents very different constitutional questions.

---

**73.** Although this court "may not require the legislature to .select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved", *Gregg, supra,* 428 U.S. at 175, 96 S.Ct. at 2926, 49 L.Ed.2d at 876, the fact that the challenged punishment appears substantially more severe than necessary to achieve the Legislature's avowed penal objectives is a factor that must be weighed in judging the sentence's propriety under the Eighth Amendment. *Furman, supra,* 408 U.S. at 282, 92 S.Ct. 2726 (Brennan, J., concurring); *Gregg, supra,* 428 U.S. at 182–183, 96 S.Ct. at 2929, 49 L.Ed.2d at 880 ("Although we cannot 'invalidate a category of penalties because we deem less severe penalties adequate to serve the ends of penology,' the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering." (Citation omitted))

**74.** It is worth noting that the *Report of the Temporary State Commission to Evaluate the Drug Laws,* Legislative Document (1972) No. 10 indicated that it would be reasonable to make possession of one aggregate *pound* of illicit drug an A felony, noting specifically that possession of that amount of a narcotic drug "is indicative of major dealership."

**75.** *Coker, supra,* —— U.S at ——, 97 S.Ct. 2861.

Much of the discussion concerning the Eighth Amendment validity of Ms. Carmona's and Ms. Fowler's sentences is simply inapplicable to Ms. Foggie. Although she too received the mandatory maximum sentence of life imprisonment, she was released shortly after serving her minimum term. Since it is patent that she will not be serving a life sentence, and since, even if she were to be adjudicated a parole violator and returned to prison, she would nonetheless now be subject to later release and ultimate discharge from parole on the same basis as all other parolees, the court cannot hold that the punishment imposed upon her for the offense of selling $40 worth of cocaine is so grossly disproportionate as to violate the Eighth Amendment. Nor, even taking into account all the evidence concerning the implementation of the law with whatever arguable inequities may be attendant thereto, can the court hold that this punishment—of one year's imprisonment and subsequent parole—violates the Eighth Amendment under the alternative criterion set forth in *Coker.* —— U.S. at ——, 97 S.Ct. 2861.

However, as indicated previously, Ms. Foggie has challenged the constitutionality of her sentence under the Due Process and Equal Protection Clauses, as well as under the Eighth Amendment. While this argument obviously differs in some respects from the Eighth Amendment argument, it is predicated upon the same observations concerning the drug law and its application.

Briefly stated, the argument is that the challenged drug law irrationally and without legal justification singles out class A drug felons for especially harsh punishments, which are then imposed in an arbitrary manner bearing little, if any, relationship to the gravity of the offense involved. As applied to Ms. Foggie, the court finds this argument to be without merit.

██ It is undisputed, in the first place, that the sale of a quantity of cocaine, however small, is an act which the State may properly make subject to its penal laws. *See Robinson, supra,* 370 U.S. at 664, 82 S.Ct. 1417. And there is no question in this case that Ms. Foggie did, indeed, commit the act for which she was convicted.

██ Since Ms. Foggie, at this point, clearly lacks standing to complain both of the indeterminate life sentence and also of the previously effective lifetime parole provision, her challenge is necessarily restricted to those portions of the drug law which differ from the treatment of other offenders, specifically, the previously effective preclusion of plea bargaining for A–III felony offenders, and the predication of probation, in part, upon a recommendation from the prosecutor.[76]

██ In the court's view, the State of New York could preclude A–III felony offenders from pleading to reduced charges without offending the Equal Protection or Due Process Clauses of the Constitution. The clear purpose of that provision was to ensure that all those persons accused of class A drug felonies [77] would be subject to some mandatory sentence of imprisonment (with very limited possibility for probation), presumably both to isolate them from the rest of society for some period of time, and to deter others from committing similar offenses. (Although those persons accused of A–I and A–II felonies are allowed to plead guilty to A–III felonies, they do not thereby escape some mandatory imprisonment.) Relatively speaking, of course, this provision was more onerous to those accused of A–III offenses than to those accused of A–I and A–II offenses; the A–III offender could not gain any benefit from pleading guilty. Moreover, this preclusion served to set apart class A drug offenders as a class from all other persons accused of felonies in New York.

However, in the court's view, this distinction bears a clearly rational relation to the

---

76. As noted previously, the court has already ruled that Ms. Foggie failed to exhaust her state remedies on the issue of preclusion of bail pending appeal.

77. Unless acquitted, recommended for probation, or adjudicated youthful offenders.

Legislature's defensible goal of ensuring that relatively more serious drug offenders all receive a prison term as a deterrent to other crime.[78] It is certainly not to be discounted, of course, that the Legislature has since altered this provision to allow those accused of A–III offenses to plead guilty to as little as a C felony, and that the Governor himself has termed the restriction "irrational".[79] However, the principal reason both for the Governor's remark and also for the Legislature's action appears to be that the restriction caused a considerable backlog of A–III cases for trial and diverted prosecutorial resources, at great expense, from prosecution of major violent crimes. Neither the Governor nor the Legislature thereby conceded that the restriction of plea bargaining did not serve some deterrent purpose. Moreover, the testimony in this court made clear that at least one principal (and, from the State's point of view, desirable) side effect of this restriction was that more defendants were willing to cooperate in providing law enforcement officials with information concerning drug activities in the hope of obtaining a recommendation for probation, rather than facing the harsh penalties provided for class A drug felons. While the restriction on plea bargaining for A–III felons clearly contributed substantially to court congestion and delays and thereby increased the likelihood that A–I and A–II felons would plead to A–III charges, this court cannot say, from the evidence before it in this case, that the restriction on plea bargaining is so devoid of any substantial relation to any legitimate state purpose that it violates the Equal Protection Clause, even having due regard for the very substantial interests at stake on the part of the criminal defendants involved.

Much the same can be said of the provision restricting probation to those persons who, in the eyes of the prosecutor, are able to provide "material assistance" in the investigation or prosecution of drug offenses.[80] There exists no constitutional "right" to be placed on probation, rather than receive a sentence of imprisonment for a crime which the state may legitimately punish. And this court cannot find that it is unconstitutional for the State to extend this benefit only to those defendants who, in turn, are able and willing to extend a benefit to the State through cooperation. *See Brady v. United States*, 397 U.S. 742, 753, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Probation is, of course, not generally available to persons convicted of class A felonies,[81] and is made available to class A–III felons only on this conditional basis. The obvious purpose of this exception was "to get small fry drug dealers or addicts to cooperate in the apprehension and conviction of the bigger traffickers." [82] It is certainly possible that, in many instances, the persons initially accused of A–III crimes due to the small amounts of narcotic-containing substance involved may be unable to provide the information that more serious offenders might have available. And the anomalous result could be that those persons initially accused of dealings in larger amounts could be allowed to plead down to A–III offenses and *then* be granted probation in exchange for their greater store of marketable information. However, this court cannot hold that, on that basis alone, the statutory distinction drawn between class A–III felons and those other felons eligible for probation without condition is so

---

**78.** The court has ruled that, in the case of Ms. Carmona and Ms. Fowler, the life sentences are so disproportionately severe as to violate the Eighth Amendment. The court does not thereby hold, of course, that the life sentences provided for class A felons could never be applied in any case consistent with the strictures of the Eighth Amendment.

**79.** In his message of August 9, 1975 accompanying his veto of a bill eliminating the plea bargaining restriction on A–III felonies. The bill was disapproved because it also imposed across-the-board plea bargaining restrictions in all major non-drug felonies.

**80.** Penal Law § 65.00(1)(b).

**81.** Penal Law § 60.05(1).

**82.** Practice Commentary of Arnold Hechtman, McKinney's Cons. Laws of New York, Book 39, Penal Law § 65.00, p. 170.

unrelated to a rational state purpose, *i. e.,* inducing cooperation by lesser drug offenders, that it violates the Equal Protection Clause. The fact that, in practice, the statute may operate in such a way as to allow certain more serious drug dealers to escape imprisonment does not render the provision irrational, nor does it wholly vitiate the purpose for which it was enacted.

In sum, the court finds no constitutional infirmity in Ms. Foggie's conviction or sentence.

### RELIEF

Since the court has declared unconstitutional the maximum sentences imposed upon Ms. Carmona and Ms. Fowler, the State is directed to discharge them from incarceration at the expiration of their minimum terms of imprisonment unless new, and constitutionally appropriate, maximum sentences are imposed within 90 days of filing of this opinion.

### ORDER

In accordance with this Court's opinion dated August 4, 1977, it is now Ordered, Adjudged and Decreed as follows:

1. Petitioners Martha Carmona and Roberta Fowler are to be unconditionally discharged from incarceration and custody at the expiration of their minimum terms of imprisonment unless, within ninety (90) days from August 4, 1977, new, and constitutionally appropriate maximum sentences, are imposed upon these petitioners.

2. The petition of Donna Foggie is dismissed without prejudice to later challenging failure to discharge her from parole custody at the time that she first becomes eligible under state law for consideration for such discharge and without prejudice to filing a new petition challenging her original life sentence in the event of re-incarceration pursuant thereto.

So Ordered.