**UNITED STATES of America, Appellee,**

v.

**Johnnie Catherine KALLEVIG,**
**Defendant-Appellant.**

**No. 75–1281.**

United States Court of Appeals,
First Circuit.

Argued Feb. 6, 1976.
Decided April 21, 1976.

Blas C. Herrero, Jr., Hato Rey, P. R., with whom Jose M. Herrero, Hato Rey, P. R., was on brief, for appellant.

Ann T. Wallace, Atty., U. S. Dept. of Justice, Washington, D. C., with whom Julio Morales-Sanchez, U. S. Atty., and Sidney M. Glazer, Atty., U. S. Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before MATTHES *, McENTEE and CAMPBELL, Circuit Judges.

McENTEE, Circuit Judge.

On February 20, 1975, appellant was indicted on two counts charging her with federal drug law violations.[1] After a jury-waived trial on April 14 and 15, 1975, she was found guilty of both charges and on June 20 was sentenced to concurrent five-year terms of imprisonment. Her appeal alleges two separate errors in the proceedings below, viz. the court's failure to sup-

press evidence obtained as the result of a "strip search" and its admitting into evidence of a confession which she claims was obtained in violation of the principles of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We consider these points in order.

## I. *Legality of the Strip Search*

On the evening of January 16, 1975, appellant arrived at the San Juan International Airport on a flight from Caracas, Venezuela. She and her traveling companion approached the passport and customs checkpoint which was manned by Juan R. Rodriguez, a Customs Patrol Officer with seven years experience. Officer Rodriguez noted that appellant was coming from Venezuela and that her passport indicated she had recently made brief trips to Peru, Colombia and Trinidad-Tobago, as well as to Venezuela. (Each of these countries is among those which customs officials consider to be important sources of narcotics.) Because of this pattern of travel and the brevity of appellant's trips to these countries, and also because he considered her style of dress to be unusual,[2] Officer Rodriguez's suspicions were aroused. He so notified his supervisor, Officer Luis Andino Kiernan, who placed appellant's name and that of her companion in a government computer system. The computer print-out soon revealed that in 1972 appellant had been a suspect in a case involving the receipt of a small amount of marijuana by mail but that prosecution had been declined. Officer Andino Kiernan informed Rodriguez of this information, but they took no further steps at that time. Appellant and her companion then proceeded from the passport checkpoint to the baggage inspection posts, but they separated as they did so and presented themselves to different inspectors—a fact

---

* Of the Eighth Circuit, sitting by designation.

1. Count I charged violation of 21 U.S.C. § 952(a) by reason of intentionally importing into the United States approximately 2.2 lbs. of cocaine. Count II charged violation of 21 U.S.C. § 842(a)(1) because of possession with intent to distribute the same 2.2 lbs. of cocaine.

2. Appellant was wearing an old-fashioned dress, which had an "empire" type waist that encircles the body at a much higher point than do most dresses and falls loose below that point. (The district court noted that such a dress "gives a pregnant appearance.")

which struck the two customs officers as unusual. Officer Rodriguez also noted that appellant seemed to be nervous during the baggage inspection process.

On the basis of these facts, Rodriguez chose to carry out a secondary inspection of appellant's baggage. (This involved a thorough search of her suitcases, the removal of the backs of two radios, and the like.) This inspection produced nothing of an incriminating nature, so Rodriguez and Andino Kiernan decided that a personal search of the appellant would be appropriate. For this purpose they called upon a female customs officer, Inspector Tina Ramirez, to conduct a search of appellant's person. The method and results of the search conducted by Inspector Ramirez are well summarized in the words of her own testimony at trial:

> "We went to a little room that is prepared specially to make personal searches which is close to the enforcement area.
>
> . · . · .
>
> . . . She had on a very loose dress. You couldn't see anything under the dress. I asked her to remove the dress and she removed the dress and she had a one piece girdle on and I asked her to put it down. As soon as she put it down I could see that she had something taped to her body." [3]

That "something" proved to be cocaine and led to appellant's arrest. She now disputes, as she did below, whether the strip search was justified.

■ To date we have carefully refrained from deciding exactly what grounds are required in order to justify a strip search.[4] *United States v. Arias Flores*, 477 F.2d 608 (1st Cir.), *cert. denied*, 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973). Something less than probable cause will suffice, *id.* at 609, but we have specifically declined to decide whether the real suspicion standard[5] or the less demanding mere suspicion test is the appropriate one. *Id; United States v. Stornini*, 443 F.2d 833 (1st Cir.), *cert. denied*, 404 U.S. 861, 92 S.Ct. 162, 30 L.Ed.2d 104 (1971). Here, again, we need not opt for either standard. In the case before us, there were more than enough "objective, articulable facts" to support the officers' subjective suspicion and therefore to satisfy the real suspicion standard. While a perception of nervousness alone may be insufficient to justify a strip search, *United States v. Price*, 472 F.2d 573, 575 (9th Cir. 1973), it is one factor which may properly be considered, *United States v. Glaziou*, 402 F.2d 8 (2d Cir. 1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969); *see United States v. Mastberg*, 503 F.2d 465, 469–70 (9th Cir.

---

**3.** The search conducted by Inspector Ramirez was more than a "pat down" search, but it was in no sense a body cavity search. Rather it was a classic example of a "strip" or "skin" search. *See generally* Note, From Bags to Body Cavities: *The Law of Border Search*, 74 Colum.L.Rev. 53, 73–87 (1974).

**4.** Of course a border search that is less intrusive than a strip search requires no level of suspicion on the part of customs officials. "[I]t is too well established to require citation of authority that such searches are unique, that the mere fact that a person is crossing the border is sufficient cause for a search. Thus every person crossing our border may be required to disclose the contents of his baggage, and of his vehicle, if he has one. The mere crossing of the border is sufficient cause for such a search." *Henderson v. United States*, 390 F.2d 805, 808 (9th Cir. 1967). *See also United States v. Stornini*, 443 U.S. 833, 835 (1st Cir.), *cert. denied*, 404 U.S. 861, 92 S.Ct. 162, 30 L.Ed.2d 104 (1971).

**5.** The real suspicion standard was first formulated by the Ninth Circuit. That court defines real suspicion as "subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law." *United States v. Guadalupe-Garza*, 421 F.2d 876, 879 (9th Cir. 1970). *See also United States v. Johnson*, 425 F.2d 630 (9th Cir. 1970), *cert. dismissed*, 404 U.S. 802, 92 S.Ct. 38, 30 L.Ed.2d 35 (1971).

*Cf. United States v. Brown*, 499 F.2d 829, 833, *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619 (1974), where the Seventh Circuit insightfully commented that "[w]hat is required to be balanced in any particular case is the level of suspicion of the agent against the level of indignity perpetrated upon the traveler."

1970). In addition to appellant's nervousness, the officers observed that her dress was unusual;[6] this is also a factor which may properly be used to substantiate a "real suspicion," *United States v. Wilson*, 488 F.2d 400 (5th Cir. 1973), *cert. denied*, 416 U.S. 989, 94 S.Ct. 2397, 40 L.Ed.2d 767 (1974). *United States v. Forbicetta*, 484 F.2d 645 (5th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974). They also properly noted the pattern and brevity of her recent visits to countries considered to be important sources of drugs, *cf. United States v. Shields*, 453 F.2d 1235, 1236 (9th Cir.), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1615, 31 L.Ed.2d 821 (1972); her separation from her traveling companion, *cf. United States v. Holtz*, 479 F.2d 89 (9th Cir. 1973); *United States v. Gil de Avila*, 468 F.2d 184 (9th Cir. 1972), *cert. denied*, 410 U.S. 958, 93 S.Ct. 1428, 35 L.Ed.2d 692 (1973); and the information provided by the computer, *cf. United States v. Chase*, 503 F.2d 571, 572 (9th Cir. 1974), *cert. denied*, 420 U.S. 948, 95 S.Ct. 1332, 43 L.Ed.2d 427 (1975); *United States v. Williams*, 459 F.2d 44 (9th Cir. 1972).

We need not decide exactly which or how many[7] of these indicia would be necessary predicates for a "real suspicion." In this case the indicia were so numerous and so convincing that there unquestionably was a basis for "real suspicion," and we are convinced that the strip search was fully justified.

---

**6.** The dress was unusual in that it was out-of-style and was designed in such a manner that it would serve to conceal any objects which might be attached to the body. For both of these reasons it is understandable that it attracted the attention of the customs officers.

**7.** *See* Columbia Law Review "Note," *supra* n. 3 at 75.

**8.** On cross-examination, Officer Santiago presented a slightly different version of appellant's words:

"Q. Now will you tell us then, tell the Court precisely what it was that the Defendant mentioned about wanting a Lawyer to be present.

## II. *The Miranda Question*

Shortly after her arrest at the airport, appellant was orally advised of her constitutional rights. She was then taken to the Drug Enforcement Administration (DEA) office in Hato Rey where she was again orally advised of her rights. She was then presented with a printed form bearing both the *Miranda* warnings and a declaration of waiver of the constitutional rights referred to in the *Miranda* warnings. This form she refused to sign. Her refusal was described by the DEA officer who had presented the form to her as follows:

"[A]fter she read this form over and over, I asked her, 'If you understood your rights as explained on the printout in that form' and she said, yes and then I asked her if she wanted to sign that form and she said, 'No, I will not sign anything until I see my Attorney.' "[8]

Appellant was then permitted to make several collect telephone calls; apparently all the calls were to persons in California, but none was to an attorney. After she had made these calls, but without any indication of a change of attitude on appellant's part,[9] the same DEA officer referred to above continued, despite her refusal to sign the form, to interrogate her about possible receivers of the cocaine in California and succeeded in obtaining a series of seriously incriminating statements from her.

Appellant contends that the process of interrogation employed here violated the

---

"A. Yes, when she had the time to read the form, many times examine it, I asked her, 'Do you understand your constitutional rights as explained in that form?' and she said, 'Yes, I am a nurse and I have had some education. I know my rights.' Just like that. I said 'Do you want to sign that form?' and she said, 'No, I will not sign anything without the presence of a Lawyer.' "

**9.** Appellant and two DEA agents were together in an office awaiting the arrival of the United States Magistrate; according to the testimony of one of the agents, she was talking with them about her son in California. She in no way directed the conversation to the offense for which she had been arrested.

rules set forth in *Miranda v. Arizona*,[10] and that the district court erred in admitting into evidence the incriminating statements made by appellant in response to the interrogation.

The facts of this case permit forceful arguments to be made both in favor of holding that a voluntary and intelligent waiver of rights was made as well as for a contrary holding; and there is an abundance of case law which could help to buttress either conclusion. *See, e. g., United States v. Johnson,* 529 F.2d 581, 18 Crim.L. Rep. 2517 (8th Cir. 1976); *United States v. Sawyer,* 504 F.2d 878 (5th Cir. 1974), *cert. denied,* 421 U.S. 916, 95 S.Ct. 1578, 43 L.Ed.2d 783 (1975); *United States v. Caulton,* 498 F.2d 412 (6th Cir.), *cert. denied,* 419 U.S. 898, 95 S.Ct. 178, 42 L.Ed.2d 142 (1974); *United States v. Hodge,* 487 F.2d 945 (5th Cir. 1973); *United States v. McDaniel,* 463 F.2d 129 (5th Cir. 1972); *United States v. Speaks,* 453 F.2d 966 (1st Cir.), *cert. denied,* 405 U.S. 1071, 92 S.Ct. 1522, 31 L.Ed.2d 804 (1972); *United States v. Ramos,* 448 F.2d 398 (5th Cir. 1971); *United States v. Phelps,* 443 F.2d 246 (5th Cir. 1971); *United States v. Crisp,* 435 F.2d 354 (7th Cir. 1970), *cert. denied,* 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); *United States v. Van Dusen,* 431 F.2d 1278 (1st Cir. 1970); *Pallotta v. United States,* 404 F.2d 1035 (1st Cir. 1968); *United States v. Nielsen,* 392 F.2d 849 (7th Cir. 1968). *See also State v. Jones,* 37 Ohio St.2d 21, 306 N.E.2d 409 (1974); *Brown v. State,* 256 Ind. 558, 270 N.E.2d 751 (1971).

We need not, however, decide which of these arguments is the more persuasive because even if a *Miranda* violation did occur in the course of the interrogation, we are convinced beyond a reasonable doubt that it would have constituted harmless error. *Chapman v. California,* 386 U.S. 18, 24,

87 S.Ct. 824, 828, 17 L.Ed.2d 705, 710 (1967). The substantial amount of cocaine found on appellant's person constituted overwhelming evidence of her guilt quite apart from her own admissions.

Accordingly, the judgment of the district court must be affirmed.

---

**10.** The following passage from *Miranda* is particularly relevant to appellant's argument:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. . . . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 473–74, 86 S.Ct. at 1627, 16 L.Ed.2d at 723.