UNITED STATES of America, Appellee,

v.

Wendy Jean WARDLAW, etc.,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Beverly Deanne RANDELL, etc.,
Defendant, Appellant.

Nos. 77–1294, 77–1295.

United States Court of Appeals,
First Circuit.

Argued Feb. 10, 1978.

Decided May 16, 1978.

Michael D. Nasatir and Donald M. Re, Los Angeles, Cal., with whom Mark V. Kaplan and Alvin S. Michaelson, Beverly Hills, Cal., were on briefs, for defendants, appellants.

Joseph S. Davies, Jr., Atty., Dept. of Justice, Washington, D. C., with whom Julio Morales Sanchez, U. S. Atty., San Juan, P. R., and Jerome M. Feit, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

Wardlaw and Randell[1] appeal from their convictions and sentences on charges of importing cocaine into the United States in violation of 21 U.S.C. § 952(a) and possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). After moving unsuccessfully to suppress the cocaine found on their persons, defendants waived trial by jury, stipulated that the substance seized from them was cocaine, and submitted the question of their guilt on

the basis of the evidence presented at the suppression hearing. The court found both guilty and sentenced each to two ten year terms of imprisonment, to be served concurrently. It further imposed a concurrent special parole term of three years on each count. For the reasons discussed below, we affirm the convictions but remand the cases for resentencing.

### I. *Motions to Suppress*

Appellants challenge their convictions on the ground that the district court erred in refusing to suppress the cocaine seized as a result of searches of their persons at the San Juan International Airport. The Government presented the testimony of three United States Customs Service personnel who together singled out defendants for special searches and discovered the cocaine they were carrying. Their testimony, taken in the light most favorable to the Government, established that Wardlaw and Randell arrived at the airport about 5:00 p. m. on August 29, 1976, on a flight from St. Thomas. Luis Andino, a supervisor, became suspicious of the defendants when, talking together, they came into the customs enclosure wearing raincoats. None of the other passengers wore rain gear, and as far as Andino could tell it had not been raining outside. Andino gave a nonverbal signal to Carlos Flores, an inspector, indicating the two women bore watching. Meanwhile the defendants had joined a line of persons being processed by Inspector Velez. Inspector Giovanna Buono had no passengers at her line and asked Wardlaw to come over from Velez's line. Wardlaw said something to Randell and then came over to Buono. Wardlaw appeared very nervous, and her tension increased when Buono asked her whether she had a passport.[2] Although Wardlaw was wearing a loose-fitting dress underneath her raincoat, Buono detected an

---

1. Although appellants were indicted and tried as Beverly Deanne Randell and Wendy Jean Wardlaw, the names under which they were travelling, their real names apparently are Jo Ann Euphemia Thorne and Jennifer Rose. They will be referred to here as Randell and Wardlaw.

2. According to Buono, Wardlaw "was really tense because a person can just be tense and you know, but she was like this, like she couldn't breathe and I didn't know what was wrong with her."

apparent bulge around her midsection. Inspector Flores came over to Buono, and Buono asked permission to perform a secondary search on Wardlaw. Flores agreed, as he had noted Wardlaw's unusual dress and nervousness as well as Andino's signal.

In the secondary inspection room, Wardlaw refused to obey Buono's command to raise her skirts and instead demanded a lawyer. Buono came out, told Flores what had happened, and then saw Randell leave the customs enclosure. Buono told Flores that Wardlaw and Randell were together, and Flores ordered her to take an armed customs officer and follow Randell. While other women inspectors remained with Wardlaw, Buono observed Randell sit in a seat in front of the airport where the taxis embarked. After waiting a few minutes to see if anyone approached Randell, Buono went up to her. She told Randell her friend was not feeling well and needed help. Randell at first refused to come back inside the airport, but when Buono insisted she reluctantly agreed. Once inside, Buono took Randell into an area for secondary inspection and asked her to undress. Plastic bags containing a white powder were found taped to her legs. A field test established that the substance was cocaine, and Randell was placed under arrest.

As Randell was being led to the office where the cocaine was to be field tested, she broke free momentarily and managed to reach Wardlaw and to whisper something in her ear. After leaving Randell with the other inspectors, Buono returned to Wardlaw and again asked her to undress. After some delay, Wardlaw permitted Buono to remove her clothes. Bags of white powder, which subsequently turned out to be cocaine, were taped to her body.

Inasmuch as these searches occurred at an international border, the standards applicable to them are considerably more relaxed than those applicable to ordinary searches. In *United States v. Kallevig*, 534 F.2d 411 (1st Cir. 1976), we noted the existence of different approaches to test the appropriateness of particular border searches. We did not decide which approach to follow, as the search there met even the most stringent of the proposed tests, but we did quote with approval the observation of the Seventh Circuit that "[w]hat is required to be balanced in any particular case is the level of suspicion of the agent against the level of indignity perpetrated upon the traveler." *Id.* at 413 n. 5 (quoting *United States v. Brown*, 499 F.2d 829, 833 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974)). Since we decided *Kallevig* the Fifth Circuit has developed and applied the principle stated in *Brown* in a variety of cases. The standard that has emerged, described by the Fifth Circuit as a "reasonable suspicion" test, *United States v. Afanador*, 567 F.2d 1325, 1328 (1978), requires the Government to demonstrate some objective, articulable facts that justify the intrusion as to the particular person and place searched. *Id.* at 1328–29 & n. 4; *United States v. Himmelwright*, 551 F.2d 991, 995 (5th Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). The quantum of facts necessary to justify a search is related to the degree of the intrusion: "what constitutes 'reasonable suspicion' to justify a particular search may not suffice to justify a more intrusive or demeaning search." *Afanador, supra* at 1328. We recognize the indefiniteness of this test and the need for its development on a case-by-case basis, but we feel it provides the starting point for analyzing the particular facts of individual border searches. Applying the "reasonable suspicion" mode of analysis here, we hold that sufficient objective, articulable facts existed to have led an experienced, prudent customs official reasonably to suspect defendants of concealing contraband on their persons.

As to Wardlaw, her raincoat and obvious tension initially attracted the inspectors' attention. Although a raincoat might not be considered outlandish apparel for a visitor to Puerto Rico, the inspectors believed the weather to be dry that afternoon and noted both that defendants alone wore raincoats and that the coats were dry. Furthermore, Buono, who the district court found to have

proposed the search on her own initiative, observed a suspicious bulge around Wardlaw's abdomen. In *United States v. Brown*, 499 F.2d 829 (7th Cir.), *cert. denied*, 419 U.S. 1047, 95 S.Ct. 619, 42 L.Ed.2d 640 (1974), unusual clothing that could facilitate concealment of contraband and a bulge at the waist were held to justify an initial demand for a young woman to raise her skirts. Here Buono based her demand on these factors as well as Wardlaw's tense appearance. As in *Brown*, the female inspector asked Wardlaw only to lift her skirt, a less substantial intrusion than a demand to undress fully. When Wardlaw responded to this request, which we think was clearly reasonable in these circumstances, by refusing to cooperate and asking for a lawyer Buono acquired new grounds for pressing her search and, as in *Brown*, then ordering Wardlaw to disrobe completely.

The circumstances supporting the inspectors' suspicion with respect to Randell are different, but they also justify the search made. As an initial matter, the customs officials were justified in assuming Randell and Wardlaw were companions. Adino and Flores spotted the defendants come in to the customs enclosure together, line up for inspection together, and talk together while awaiting processing. Both were wearing raincoats, as the other passengers were not. Perhaps more significantly, Buono observed Wardlaw and Randell confer briefly before Wardlaw came over at Buono's request to be inspected. Once she went outside the inspection area, Randell made no effort to leave the airport but seemed to be waiting for Wardlaw. These factors distinguish this case from *Afanador*, *supra*, where government officials had been told by an informant that a specific stewardess would be carrying cocaine on her person, and conducted a strip search of all six members of the crew. Here there was no specific information indicating that the suspects were chance companions, and the officials were justified in treating them as voluntary associates. It is true that the evidence of companionship was not as strong as in *United States v. Wilson*, 488 F.2d 400 (5th Cir. 1973), *cert. denied*, 416 U.S. 989, 94 S.Ct.

2397, 40 L.Ed.2d 767 (1974), where the suspects admitted to travelling together, or *Brown, supra*, where the suspects were sisters, but evidence did exist in sufficient amount. As the officials had reasonable grounds to believe Randell was associated with Wardlaw, the suspicious appearance and behavior of the latter culminating in her refusal to lift her skirt at Buono's request and her demand for a lawyer, constituted objective, articulable facts that justified the search of her similarly attired travelling companion. *Brown, supra* ; *Wilson, supra* ; *United States v. Glaziou*, 402 F.2d 8 (2d Cir. 1968), *cert. denied*, 393 U.S. 1121, 89 S.Ct. 999, 22 L.Ed.2d 126 (1969).

■ Randell argues that inasmuch as she had already cleared customs when the inspectors asked her to return for further inspection, the subsequent search could not be classified as a border search but rather required greater justification by the Government. The cases on which she seeks to rely, however, are completely inapposite. In *United States v. Selby*, 407 F.2d 241 (9th Cir. 1969), the passengers of a car cleared customs at the Texas border, headed northward, and were later stopped many miles inland and returned to the border, where a second search was made. In *Montoya v. United States*, 392 F.2d 731 (5th Cir. 1968), the suspects had left the airport after clearing customs and had checked into a hotel in downtown Miami. In both cases the objects of the searches had clearly removed themselves from the border area and entered the mainstream of domestic activity. Where a suspect has merely passed through a luggage inspection but not yet left the site of her arrival into the country, i. e. the "border", as was true of Randell, courts agree that a secondary body inspection is a border search governed by the less restrictive standard applicable to the initial inspection. *Brown, supra* ; *United States v. Maggard*, 451 F.2d 502 (5th Cir. 1971); *see United States v. Cristancho-Puerto*, 475 F.2d 1025 (5th Cir.), *cert. denied*, 414 U.S. 869, 94 S.Ct. 181, 38 L.Ed.2d 115 (1973). Accordingly, we

affirm the district court's denial of the motions to suppress.[3]

## II. *The Sentence*

■ Before the hearing on sentence, the district judge in chambers indicated to counsel his inclination to impose a lengthy sentence. At the hearing, counsel for Wardlaw stressed his client's excellent presentence report, cooperation with the authorities, strong family background, lack of prior criminal involvement, excellent record as a medical student, and relative youth (she was 23 at the time of sentencing). The Government recommended a maximum sentence of four years, arguing that a more severe sentence would be unnecessary and might be inconsistent with previous sentences by the judge in similar cases. Randell also was young (21), a first offender, had cooperated with the authorities, and had an excellent presentence report. The district court chose, however, to focus on what it considered to be the special need to discourage narcotics smuggling. The judge conceded that these defendants were simply "mules," the carriers of contraband rather than narcotics dealers, but maintained that through defendants such as these the authorities would be able to reach the higher-ups in drug trafficking:

"The Court: . . . It is the mule owner we are after. We are not after these mules.

"[Counsel for Randell]: Then why punish her to the extent Your Honor wants to?

"The Court: It is the only way that we can get the mule owners to bring the drugs themselves. That is the only way to get them out. That is as long as we keep them doing nothing because they happen to be mules, they are going to take advantage of others, and that is what we want to stop. I want this, the word to spread around that these mules are getting worse treatment than the mule owners and then they will stop being mules because they have to think about it twice before they proceed and no one is going to do the dirty work for them.

. . . . .

"We cannot just take the factors of rehabilitation and punishment or start thinking that she is going to be sour. So she is going to be sour. Am I going to cry about it? No, I am not going to cry about her being sour. I will tell you why, because I am afraid that some drug peddler is going to get to my child and that is what I am trying to prevent. So you see, I rather have happiness in my home [sic] even if it is at the expense of having sourness at her home. That is the way I look at it because I have to be strong in these sentences so that the time will come that the word spreads around . . . that the mules are going to be hit and hit hard so they will not do it and when they don't do it the mule owners are going to come out and I know that we have good agents who take a lot of risks in doing their jobs and they do it to put an end to this. . . . Those agents are really going to enjoy it when they catch one of them. I am sure they don't enjoy it when they catch one of these girls. They don't enjoy it, I am sure of that. They are after the big ones and those are the ones that are hard to get."

At Wardlaw's sentencing the court was even more vehement in expressing its desire to reach large dealers through harsh sentencing of mules:

"Now, I have read your pre-sentence report with great pain. I mean I look at your record here, and you are a student of medicine. That should be enough but not only that, you are a good student. Your average is above three. I wish I had that kind of average myself when I was in school. No, no, it is hard to under-

---

**3.** On their supplemental brief defendants for the first time raised the argument that because 21 U.S.C. § 952(a) does not specifically mention the Commonwealth of Puerto Rico as among the jurisdictions into which the smuggling of cocaine is prohibited, the convictions on these counts must be reversed. This court confronted exactly this question in *Dario Sanchez v. United States*, 256 F.2d 73 (1st Cir. 1958), and held to the contrary.

stand. Why is it that a good mind takes the wrong road? I don't know. I just can't find the reason for that.

"Counsel, I wish I could express in better words than I can how sorry I am, how deeply sorry I am to have to impose this kind of sentence. I wish I could handle these cases in another manner and think of it the way you think it but it is that I just can't go through and I just can't make peace with myself if I don't take the opportunity to try to get the mule owners out of the cave. This is something which perhaps you might call it an obsession if you want it but wish I could get someone, a real big one, a fellow who put her in this business. That is the guy I want to get hold of. If the case ever comes before me, Counsel ask for my disqualification because I am going to grant it if he is going to be tried before me because that is the guy we are after really, not against this young lady. That is the guy we are after."

The court found in particular that Randell, who was subject to the provisions of the Youth Corrections Act, 18 U.S.C. §§ 5005 *et seq.*, and Wardlaw, who was eligible for similar consideration, would not benefit from treatment under that Act and instead required sentencing under the applicable adult penal provisions. Recognizing the maximum sentence for each count of their convictions was fifteen years, the court, as stated before imposed two concurrent ten year sentences on each defendant.

Defendants attack their sentences as being so harsh as to violate constitutional norms. They also say that the sentencing judge's remarks show that he based the sentences on impermissible considerations. Turning first to the claim of unconstitutionality, the sentences are indeed harsh for first offenders. But we cannot say they are so high as to violate the eighth amendment. Sentences that are extremely disproportionate to the offense have sometimes been held to violate the prohibition against cruel and unusual punishment. *See Coker v. Georgia,* 433 U.S. 584, 591–92, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977); *Ingraham v. Wright,* 430 U.S. 651, 665–66, 97 S.Ct.

1401, 51 L.Ed.2d 711 (1977); *Rummel v. Estelle,* 568 F.2d 1193 (5th Cir. 1978); *Roberts v. Collins,* 544 F.2d 168 (4th Cir. 1976), *cert. denied,* 430 U.S. 973, 97 S.Ct. 1663, 52 L.Ed.2d 368 (1977); *Downey v. Perini,* 518 F.2d 1288 (6th Cir.), *vacated and remanded,* 423 U.S. 993, 96 S.Ct. 419, 46 L.Ed.2d 367 (1975); *Hart v. Coiner,* 483 F.2d 136 (4th Cir. 1973), *cert. denied,* 415 U.S. 983, 94 S.Ct. 1454, 39 L.Ed.2d 495 (1974). Inordinate sentences for drug convictions have been overturned on this theory. *Carmona v. Ward,* 436 F.Supp. 1153 (S.D.N.Y.1977); *Davis v. Zahradnick,* 432 F.Supp. 444 (W.D. Va.1977). But the sentences involved in the latter two cases—life in *Carmona,* forty years in *Davis*—were far greater than those under attack here. Relatively recently a maximum sentence of fifteen years for conspiracy to distribute cocaine, imposed upon a first offender, was held not to be cruel and unusual punishment. *United States v. Sanchez,* 508 F.2d 388 (5th Cir.), *cert. denied,* 423 U.S. 827, 96 S.Ct. 45, 46 L.Ed.2d 44 (1975). *See also State v. Coutcher,* 198 Kan. 282, 424 P.2d 865 (1967); *State v. Chaffin,* 30 Ohio St.2d 13, 282 N.E.2d 46 (1972). Especially when there is taken into account the fact that defendants had on their persons over six pounds of cocaine, a very large quantity, it cannot be said that the sentences here were so "grossly out of proportion to the severity of the crime" as to be unconstitutional. *Gregg v. Georgia,* 428 U.S. 153, 173, 96 S.Ct. 2909, 2925, 49 L.Ed.2d 859 (1976) (plurality opinion).

Appellants' better argument is that the judge's remarks at sentencing show the sentences to rest upon an impermissible approach to the sentencing process. In *United States v. Foss,* 501 F.2d 522 (1st Cir. 1974), this court confronted an attack on a three-year sentence for illegal distribution of cocaine based on the district court's failure to "individualize" the sentences. We noted the general rule "that a court of appeals may not reverse or tamper with a sentence that is within legal limits." *Id.* at 527 (citing *Dorszynski v. United States,* 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855

(1974)). However, we also recognized a limited exception to that rule where the sentencing court in effect refuses to exercise its discretion:

"Sentences dictated by a 'mechanistic' concept of what a particular type of crime invariably deserves have been held to fall within this exception: a judge holding such fixed ideas is presumably closed to individual mitigating factors."

Id.; see United States v. Hartford, 489 F.2d 652 (5th Cir. 1974); Woolsey v. United States, 478 F.2d 139 (8th Cir. 1973); United States v. Daniels, 446 F.2d 967 (6th Cir. 1971); United States v. McCoy, 139 U.S. App.D.C. 60, 429 F.2d 739 (1970) (dictum); cf. United States v. Baker, 487 F.2d 360 (2d Cir. 1973). We observed that the duty to take the individual defendant into account did not mean a sentencing judge could not assess the sentence's presumed effects on others, and that general deterrence was a legitimate factor to be considered in arriving at a sentence. But always these effects had to be considered along with the individual circumstances of the defendant:

"The court's duty to 'individualize' the sentence simply means that, whatever the judge's thoughts as to the deterrent value of a jail sentence, he must in every case reexamine and measure that view against the relevant facts and other important goals such as the offender's rehabilitation. Having done so, the district judge must finally decide what factors, or mix of factors, carry the day. While the judge's conclusions as to deterrence may never be so unbending as to forbid relaxation in an appropriate case, they may nonetheless on occasion justify confinement although other factors point in another direction."

Id. at 528.[4]

Closely related to the exception discussed in Foss is the rule requiring the vacation of sentences where the district court has rested its determination on some improper or at least very questionable assumption. Where

a district court indicated that it was punishing the defendant for coming from out of state, United States v. Diamond, 561 F.2d 557 (4th Cir. 1977), or announced a belief that all drug smugglers were repeat offenders, whether or not the defendant had an arrest record, United States v. Cavazos, 530 F.2d 4 (5th Cir. 1976), new sentences have been required. Compare Marano v. United States, 374 F.2d 583 (1st Cir. 1967).

In determining whether the above exceptions apply here, it must also be remembered that defendants, because of their youth, were eligible for special treatment in sentencing. Randell, who was 21, came under the Youth Corrections Act, 18 U.S.C. §§ 5005 et seq., and Wardlaw, who was 23, could have been sentenced as a youthful offender by virtue of 18 U.S.C. § 4216. Although the district court made express findings that the defendants would not benefit from youthful offender treatment, see Dorszynski v. United States, 418 U.S. 424, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); cf. Farries v. United States, 570 F.2d 92 (3d Cir. 1978), the existence of these alternative sentencing provisions at the very least accentuated the district court's duty to take the individual circumstances of these defendants into account in passing sentence on them. See United States v. Negron, 548 F.2d 1085 (2d Cir. 1977); United States v. Ingram, 530 F.2d 602 (4th Cir. 1976); United States v. Schwarz, 500 F.2d 1350 (2d Cir. 1974).

We conclude that the district court exceeded the bounds of its sentencing discretion. Although less than the statutory maximum, the sentences were two-and-a-half times longer than those recommended by the Government. This fact alone would not justify appellate intervention, but it reinforces the impression derived from the judge's explanation of his reasons for sentencing, that usual individual considerations played little or no part in his thinking. The judge's remarks strongly suggest that in imposing these unusually

---

4. On the particular facts of Foss, we held that the district court had demonstrated sufficient flexibility and willingness to take the defend-ants' individual circumstances into consideration. See also United States v. Wheaton, 557 F.2d 275 (1st Cir. 1977).

harsh prison terms he entirely put to one side such mitigating factors as defendants' youth, positive presentence reports, and lack of criminal records, and even such aggravating factors as the large amount of cocaine involved. Instead the judge focused—to the exclusion, it seems, of all else—on the assumed impact upon the large dealers who "run" the smugglers of meting out inflexibly harsh sentences to their agents. Such sentences were seen as bringing the dealers out in the open, inducing them to become the smugglers themselves and finally driving them into the hands of the law. It is at least questionable to what degree, if any, this theory would succeed. While it might make it harder for the dealers to recruit smugglers, it is hard to see why it would induce large dealers to become smugglers themselves. In any event, while sentencing judges have considerable discretion in sentencing, they may not relentlessly pursue at a defendant's cost a single, questionable theory while simply brushing aside all the other criteria commonly weighed by the vast majority of sentencing courts. Defendants were entitled to have their sentences set primarily in terms of the seriousness of their own crimes and associated individual factors. They were not to be viewed chiefly as instruments of retaliation against other, different criminals. The sentences must accordingly be vacated and the cases remanded for re-sentencing of both defendants. While we have no doubt that the original judge would fully comply with the spirit and intent of this opinion, we think it appropriate, and we so direct, that the resentencing be done by another judge.

*Remanded for further proceedings in conformity herewith.*