**M. M. et al., Plaintiffs,**

v.

**Irving ANKER et al., Defendants.**

**No. 78 C 492.**

United States District Court,
E. D. New York.

Feb. 6, 1979.

---

Richard Emery, New York Civil Liberties Union, New York City, for plaintiffs.

Eugene B. Nathanson, New York City (Allen G. Schwartz, Corp. Counsel, Joseph F. Bruno, Robert S. Deutsch, New York City and Gail Mitchell, of counsel), for defendants.

## MEMORANDUM AND ORDER

DOOLING, Senior District Judge.

Defendants Amicone and Heitner have moved to reinstate the jury's verdict of November 3, 1978, as to both defendants or, at least, as to the defendant Heitner, or alternatively for a new trial on the issue of liability as to both defendants.

Plaintiffs, having now amended the complaint, have renewed their motion for an order certifying the case as a class action insofar as it seeks declaratory and injunctive relief, and plaintiffs have moved as well for partial summary judgment.

1. The jury verdict included answers to specific interrogatories. The first interrog-

atory asked whether defendant Amicone had reasonable grounds to suspect that plaintiff had in her possession an object that could lawfully be searched for (a) when Ms. Amicone first commenced the search, and (b) when the search was continued with Ms. Gilbert as a witness. The jury both in the first attempt to render a verdict and in its final verdict answered, "Yes", that Ms. Amicone did have reasonable grounds at both points. The jury also said that defendant Heitner had reasonable ground to suspect that plaintiff had in her possession an object that could lawfully be searched for when he took part in the search to the extent that he did take part in it. The jury answered, "No" to the third interrogatory, Was the search of plaintiff unreasonably intrusive? (In the first attempt to render a verdict the jury had indicated that the answer to this third question was "Yes" rather than "No".) As to its general verdict the jury found for defendant Amicone and for defendant Heitner. Plaintiffs moved for judgment notwithstanding the verdict or alternatively for a new trial, and by order of November 13, made on the basis of an oral opinion rendered November 9, 1978, the verdict was set aside and a verdict in accordance with plaintiffs' motion for a directed verdict was directed against both defendants on the issues (1) of their liability to plaintiff M.M. and (2) of their defense of good faith and reasonable belief that there were reasonable grounds to suspect that plaintiff had in her possession an object that could lawfully be searched for. The issue of damages was set down for trial at a date convenient to the parties. In addition the order setting the verdict aside provided that, if the judgment entered on the directed verdict was later vacated or reversed, the motion of plaintiff for a new trial was granted on the ground that the jury's verdict was against the weight of the evidence.

Without attempting a complete summary of the oral opinion of November 9, 1978, it is enough to say that the opinion found that the evidence disclosed no issue of fact for submission to the jury arising out of the absence of prompt complaint, or on the theory that plaintiff M.M. might have con-sented to the search, and it was concluded that the school's interest in maintaining school discipline did not make Dean Amicone's pursuit of the search to the end a reasonable course of conduct toward the plaintiff M.M. The further conclusion of the opinion was that there was not a reasonable search underway at any stage of the case, and that if there had been a reasonable search to start with, it was not reasonable to pursue it to the extreme that it reached. The reasoning of the oral opinion was the following:

Dean Amicone had no reasonable ground for initiating a search. The matter was not referred to her for search. Nothing was reported to be missing, Dean Amicone did not ask whether any preliminary investigation had been made to determine whether anything was missing, and, rather than having a ground for suspecting that the child had stolen property in her possession, Dean Amicone could do no more than wonder whether or not the child might not have something stolen in her possession. The child's record for being in theft-suspicious situations, the fact that she was found in the classroom during a fire drill and had been seen there with another girl's pocketbook or book bag under her control, that plaintiff had claimed the bag as her own but had surrendered it to another girl when the girl claimed it, and that while in the classroom she had taken down posters to take home to her sister, these facts did not suggest that plaintiff had stolen property in her possession but showed that she had committed quite other offenses for which she might be disciplined. To justify searching a high school child for a possible stolen object, it is indispensable that there be a reliable report that something is missing, and not a report, however reliable, that the suspected student had an opportunity to steal.

When plaintiff was taken to Dean Amicone's office adequate ground for discipline existed on the basis of the report of what had happened; it was not a search situation but an occasion to set in motion whatever school machinery was required by the refer-

ral from Dean Janko and Mrs. Regan based on their observations and inquiries.

It may well be that the search standard in a school situation is not so strict as in criminal police investigation, and that the good faith defense to civil liability raises different issues from those that arise on a motion to suppress the use of the product of an illicit search in a criminal case, where the good faith of the policeman is immaterial. Dean Amicone here relied on her knowledge of the child's record with reference to things found in her possession or with her possessions which were not hers or were contraband, coupled with Dean Amicone's knowledge of Dean Janko's report of what happened in the classroom during the fire drill: that does not suffice to show that Dean Amicone in good faith and reasonably believed that she had reasonable ground to suspect that the child had in her possession an object for which it was lawful to search her. Dean Amicone proceeded without malice or ill will, and in the good faith belief that it was reasonable for her to proceed as she was proceeding. However, the standard of reasonableness of belief that Dean Amicone's conduct had to meet was not satisfied. The law can not tolerate as reasonable a belief on the part of the teacher that if she has reasonable grounds to suspect that a child might have in her possession property that might have been stolen, but which there was no ground to believe had in fact been stolen, so far as the teacher had been informed, that belief constituted a sufficient basis for search.

So far as concerns defendant Heitner, the evidence is that he knew that the object of the search was a small white pipe-like object, probably a reefer holder, and that he participated in the decision to prosecute such a search as had to be carried out in his absence and in the presence of a female security guard. Such a search, a body search, was so inordinate in terms of the object sought by the search, that it can not be defended on any ground. The search was so intrusive and, so far as Dean Amicone and Dean Heitner knew, so wholly unprecedented in the case of a female high school student that there is no possibility of suggesting a good faith defense.

On the motion to reinstate the jury's verdict defendants argue first that the verdict was fully supported by Dean Amicone's possessing evidence (from Dean Janko) that a student with a record for possessing other students' property was found during a fire drill in an unoccupied classroom near another student's purse which she claimed as her own, and evidence from Dean Janko that the student, *inter alia*, refused to identify herself, ran away, and demonstrated nervousness and concern about her book bag when stopped. Those are, however, not all the facts, and the contention fails to take account of Dean Amicone's own testimony.

Dean Amicone testified that Dean Janko had told her about seeing the corridor door of Mrs. Regan's classroom open, of going to close it, of seeing plaintiff in a crouch behind the door, of plaintiff's having declined to give her identity, of plaintiff's having admitted taking down the posters to decorate her sister's room, of plaintiff's having pleaded with Dean Janko not to tell her mother, of Dean Janko's seeing a book bag or purse beside where plaintiff was crouched behind the door, of his picking it up to look in it to identify plaintiff, of plaintiff's having said the bag was hers, of her leaving him holding the purse or book bag, of another girl's coming in and claiming the book bag, and of plaintiff's being identified by Mrs. Regan as the girl Dean Janko had found and questioned. Dean Amicone already knew plaintiff and her unfortunate school record, including the fact that she had been found on earlier occasions in possession of other people's property and on this occasion had claimed as hers a bag that was not hers; Dean Amicone knew specifically that plaintiff had been accused of theft by another student. When Dean Amicone took plaintiff to the Assistant Principal's room she was, she testified, concerned by what plaintiff could have done while she was alone in the room. She testified that she told plaintiff what Dean Janko had said about plaintiff's taking the posters for her sister's room and asked her whether that was right, saying

that if she really wanted the posters she could have got them by asking the teacher for them. She said that she told plaintiff that taking the posters was stealing and also pointed out to plaintiff that she had been in the room alone with other students' bags and had another's bag under her control. Dean Amicone testified that she said to plaintiff that to protect herself and others she should tell Dean Amicone whether she had anything. Dean Amicone testified that she meant by this that students might later make claims of theft and so for Dean Amicone to conduct a search of plaintiff then would give plaintiff a clean bill of health. Dean Amicone testified that Dean Janko had not reported any theft and that no one else had reported any theft, or, so far as she knew, made any inquiry about theft: the students in the class were not all in the same section and some might already have left for the day. Dean Amicone said that she commenced the search because plaintiff might be accused and a search could clear her, and that, if plaintiff had taken something, as the circumstances of staying there in the room, having another's purse, taking down the posters, etc. indicated, plaintiff's sense of it might have been one of "taking" rather than "stealing" and unaccompanied by any sense of right or wrong. Dean Amicone testified that she asked plaintiff whether she had anything that didn't belong to her and plaintiff answered, "No"; that she then either asked plaintiff whether she could look through her bag, or said something like, "Show me the contents of your book bag"; and that then plaintiff dumped out the contents of her book bag on the table. Dean Amicone testified that she reached for the bus pass holder; that plaintiff snatched it from her; that plaintiff gave her the mutilated bus pass from the holder; that Dean Amicone then saw a white object which she felt able to identify as a pipe or holder used for smoking marijuana cigarettes; that she asked for the bus pass holder, and plaintiff refused to surrender it at first, but then threw the bus pass holder down on the table and it skidded to the floor behind the table; plaintiff then retrieved the bus pass

holder, making, meanwhile, a tucking motion at the waistband of her blue jeans; that plaintiff then handed the bus pass holder, empty, to Dean Amicone, but with her fist clenched so that Dean Amicone inferred that she might be holding the white object in her fist; that the hand in fact was found to be empty; and that the body search followed. Dean Amicone testified that, after Dean Heitner came and she had reported the events to him and described what she was looking for, and joined him in the futile search of the room for the pipe and vainly asked plaintiff where the pipe was, she finally said "There will have to be a body search", and female security guards were sent for and the search conducted.

On cross-examination Dean Amicone testified that she initiated the search because of plaintiff's background and the possibility of theft, that she was searching for something that might be missing but had not been reported missing: she knew Janko had not said that anything was missing, and had said that someone else had claimed the bag or purse that plaintiff had said was hers. Dean Amicone testified that it would be hard to say that when plaintiff and she went to Ms. Laird's office she meant to search plaintiff: she may have had a search in mind, but she wanted, first, to talk to plaintiff. Beyond what she had been told, Dean Amicone testified, there was in addition plaintiff's excited state, her attitude, and her failure to respond to a general question about what had happened. Dean Amicone said that when asked about the posters, plaintiff related the incident. Dean Amicone agreed that if anything had been stolen, since it had not been reported, she would not have been able to identify it if plaintiff claimed that everything in her possession was her own; but Dean Amicone pointed out, if there were a later complaint of theft, and an accurate description, she could then link that up with what she had seen in the search.

Dean Amicone's testimony makes it clear that she did not have a suspicion that plaintiff had stolen property in her possession; on the contrary, Dean Amicone had infor-

mation only to the effect that plaintiff had been in a position in which she might have taken something in addition to the things which she admitted taking and which, whether or not she admitted taking them, had been returned to the true owner.

Since there was no occasion to initiate any search, the provocative conduct of plaintiff, resulting in the pressing of the search for the white pipe which Dean Amicone testified that she saw, did not justify it. But even if Dean Amicone had seen the white object in other circumstances and had asked plaintiff to turn it over to her, a persistent denial of possession and refusal to cooperate in a search of the bus pass holder, could not justify the length to which the search was pushed. When the pipe was not in the bus pass holder that plaintiff finally surrendered, nor anywhere in the room, nor in plaintiff's hand when she unclenched it, the inference that it might be concealed somewhere on her person out of sight competed against the possibility of a mistaken perception in the first place. The dubious import of the surely ambiguous pipe, even taking into account Dean Amicone's wish to produce evidence of the plaintiff's supposed marijuana smoking to her mother and to vindicate the school's right to insist on obedience to reasonable commands, related to discipline, involved no such legally cognizable interest as could justify so serious an invasion of the interest of privacy of a fifteen year old female high school student. In this as in every other special situation case in which there is neither a warrant nor a probable cause requirement, the determinants of legality are "the nature and extent of the governmental interests involved" and "the nature and quality of the intrusion on individual rights which must be accepted" if the search is to be legitimatized. Cf. Terry v. Ohio, 1968, 392 U.S. 1, 22, 24, 88 S.Ct. 1868, 1880, 1881, 20 L.Ed.2d 889. It has been said that "the scope of a warrantless search must be commensurate with the rationale that excepts the search from the warrant requirement". See Cupp v. Murphy, 1973, 412 U.S. 291, 295, 93 S.Ct. 2000, 2003, 36 L.Ed.2d 900; Terry v. Ohio, supra, 392 U.S. at 22, 88 S.Ct.

at 1880 (disapproving searches "based on nothing more substantial than inarticulate hunches"; noting that it had been earlier said that " 'good faith on the part of the arresting officer is not enough' . . . If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate . . . .") Border searches, which require neither warrants nor probable cause, and, so far as concerns the search of luggage, are routine, nevertheless require the application of a rather strictly applied standard of reasonable suspicion to justify a body search or strip search. See United States v. Afanador, 5th Cir. 1978, 567 F.2d 1325; United States v. Barger, 5th Cir. 1978, 574 F.2d 1283, 1285; United States v. Palmer, 9th Cir. 1978, 575 F.2d 721; United States v. Wardlaw, 1st Cir. 1978, 576 F.2d 932, 934; cf. United States v. Riviera-Marquez, 9th Cir. 1975, 519 F.2d 1227; Bouse v. Bussey, 9th Cir. 1977, 573 F.2d 548. The Court in Afanador, supra, at 1328, summed it up

" . . . what constitutes 'reasonable suspicion' to justify a particular search may not suffice to justify a more intrusive or demeaning search."

(Hurley v. Ward, 2d Cir. 1978, 584 F.2d 609, deals with the requirements for more intrusive searches of prisoners normally subject to routine but less intrusive searches).

■ No citation of authority is really needed to make clear the invalidity of the search at its initiation. That is the conclusion compelled by the evidence stated as favorably to defendants Amicone and Heitner as the record permits. Granting the propriety of the search if there were reasonable grounds to suspect that plaintiff had in her possession some lawful object of search (cf. United States v. Brignoni-Ponce, 1975, 422 U.S. 873, 882, 95 S.Ct. 2574, 45 L.Ed.2d 607; Terry v. Ohio, supra, 392 U.S. at 27–28, and, concurring opinion, 31, 88 S.Ct. 1868), the information acted upon here did not nearly rise to the level of grounds for a reasonable suspicion. That the conduct of the defendant teachers did not meet the plainly strict standard of People v. D, 1974, 34 N.Y.2d 483, 358 N.Y.S.2d 403, 315 N.E.2d 466 is very clear.

The argument that defendants should be accorded a good faith defense because of the uncertainties of the law is not meritorious. The defendants were familiar with the reasonable suspicion standard, and it had been the subject of discussion, under the guidance of the principal of the school, in part in consequence of an earlier incident at the school which had resulted in a trial and a defense verdict after a charge which was written around the reasonable suspicion approach. As *Terry v. Ohio* indicated, good faith in the inclusive sense cannot be a defense to an invasion of a constitutionally protected right, for that would, in the criminal context, strip the right of substantive content, and Section 1983 has not been read differently. *Wood v. Strickland,* 1975, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214, makes it clear that public employees upon whom are imposed duties which require the exercise of discretion are entitled to a qualified immunity from damage responsibility. The Court considered that the test of good faith invoked in these circumstances had elements both of the subjective and the objective. Said the Court (420 U.S. at 321–322, 95 S.Ct. at 1000-01),

> "The official himself must be acting sincerely and with a belief that he is doing right, but an act of violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice. To be entitled to a special exemption from the categorical remedial language of § 1983 in a case in which his action violated a student's constitutional rights, a school board member . . . must be held to a standard of conduct based not only on permissible intentions, but also on knowledge of the basic, unquestioned constitutional rights of his charges. . . . Any lesser standard would deny much of the promise of § 1983. Therefore, in the specific context of school discipline, we hold that a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student."

*Procunier v. Navarette,* 1978, 434 U.S. 555, 561–562, 98 S.Ct. 855, 55 L.Ed.2d 24, expresses the same rule. The Court in *Procunier* in effect sustained the defense but on the ground that at the time the public official acted the matter in issue, a prisoner's correspondence rights, had not been clearly established constitutional rights. But the Court reiterated the insistence of *Wood v. Strickland* and the earlier *Rhodes* case upon the official's showing not only that he believed that he had the right to proceed but that his belief was a reasonable one. The Court quoted the "knew or reasonably should have known" language from *Wood v. Strickland,* and it quoted also from *Scheuer v. Rhodes,* 1974, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, the language emphasizing that the executive's qualified immunity required the existence of "reasonable grounds for the belief formed at the time and in the light of all of the circumstances, coupled with good-faith belief".

It is to be remembered that classically the "good faith" defense available to policemen for arrests and for searches was conditioned on their showing that they had probable cause to act as they did. If they showed that and their good faith, then they were not liable even though the person whom they arrested or whom they searched was innocent of wrongdoing. Cf. *Pierson v. Ray,* 1967, 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288. *Pierson, Wood* and *Procunier* recognize the special difficulty that arises where the law is uncertain at the time when the public officer must act, and where it becomes clear only afterward that he acted without legal right. There the public officer may successfully defend by showing that he believed the law to be other than it ultimately became and that such a belief was reasonable. These and similar cases have no application here. The

defendants are being held here to the standard with which they had been familiarized and which they acknowledged as the applicable standard. The information on the basis of which the search was initiated could not reasonably be believed to come up to the reasonable suspicion standard.

Defendants suggest that, alternatively the question be certified to the Court of Appeals under 28 U.S.C. § 1292(b). The case is not appropriate for that procedure. Were the case certified and leave granted, the substantive issues in which defendants are interested would not necessarily be reached, for the Court might dispose of the appeal on the jury trial issue, or conclude simply that plaintiffs were entitled at most to a new trial. Moreover, the Court could not be assured that a trial of the damage issue might not in practical effect moot any appeal if appeal were deferred until after the trial on the damage issue.

Accordingly, the motion of defendants to reinstate the verdict or in the alternative for a new trial on the issue of liability as well as that of damages is denied and the motion to certify the case to the Court of Appeals under 28 U.S.C. § 1292(b) is denied.

■ 2. Plaintiffs have moved for partial summary judgment. In essence the motion seeks (on a class basis) a declaration that searches in high schools without warrant are unreasonable and therefore unconstitutional, that searches of students are unconstitutional unless founded upon probable cause, that the present search standard, if that set forth in the memorandum from the Chancellor to all Superintendents and school principals of March 9, 1978, is void for vagueness, that mass searches and body searches may not constitutionally be conducted and that if there has been a good faith but unsuccessful attempt to inform the students' parents of the intention to search, a student may be searched with the student's consent if the student is fully and fairly informed of his rights.

The central difficulty in dealing with plaintiffs' motion for partial summary judgment is that, while it is rested on the evidence elicited of practice in two of the New York City high schools and on two specific episodes in those schools, that involving M.M. and that involving the class in which M.F. was a student in James Madison High School, and on deposition testimony about practices in the two schools, and, to some extent, more generally, the motion as a whole advances a series of general propositions, urging their adoption as governing principles applicable to searches in all high schools. It would appear that what is required at this time is not a decision on the merits of the motion but a consideration of whether such a motion is appropriate in this case, and, if so, whether the defendant school authorities should be called upon to answer it.

Surely, as plaintiff urges, school children are not without constitutional rights, and surely it is not denied that in public schools the school situation with its special complexes of relationships materially affects the way in which constitutional and other rights, duties and responsibilities of students, teachers and administration are interrelated. The very first question which plaintiffs propose for decision is whether or not warrants should be required for school searches. There should not be any declaration either that warrants are or are not required to make school searches reasonable. Despite the innumerable cases on search and seizure in the police context, as well as in certain administrative contexts, there is no answer to the question whether a warrant is necessary to make a search reasonable. Put in another way the only answer is that there are many situations in which a search warrant should be obtained before a search is undertaken. There is no possible frequency study that could demonstrate either that warrants are required in some statistically predictable number of cases nor in any logically definable set of sub-classes of the set of all future lawful search instances. What characterizes the high school situation is that the students are in a special type of custodial status, are subject to a set of disciplinary rules, are engaged in a cooperative activity of definite purpose, and, during high school years,

change classrooms a number of times during each school day, each class being made up of a different selection of students from each other class of that day. The high school student population is a population of adolescents whose relations to parents, to school and teachers, and to the world of social intercourse and work is undergoing transformation. In this complex school world it cannot be said that in no circumstances would a warrant be required to make a search reasonable nor can it be said that the failure to seek a warrant before search makes every such school search unreasonable. It is not apparent that any useful decision can be made of general application, or that any reliable declaration could result from an effort to decide the present case in terms that extended beyond the individual cases of M.M. and M.F.

The case is no different so far as concerns the suggestion that probable cause should be required to authorize a school search. Again, it is not impossible that there may arise situations in which probable cause would be required to authorize some particular search for some particular object. Plaintiffs appear to be prepared to concede that, in some circumstances at least, a search, or something equivalent to a search, may be rested on something less than probable cause. But it is not seen that any predictively useful standard or set of standards could be devised on the basis of the data that have been adduced in the present case or could be adduced in it. The universe of future instances calling for application of some search standard is too large and various to admit of an attempt to formulate usefully precise standards without getting far beyond any actually present case or controversy.

Plaintiffs' next contention, that the "present student search standard is void for vagueness" underlines the impracticability of partial summary judgment on the search standards issues. Plaintiffs do not genuinely suggest that there is anything specifically wrong in the Chancellor's Memorandum of March 9th, but argue rather that it is not a sufficient guideline, an adequate framework for day to day practical applications.

It is only too apparent that in *People v. D*, supra, the New York Court of Appeals in a thoughtful and sensitive opinion by Chief Judge Breitel could do little more than indicate the factors to be taken into account and render a specific judgment on the reasonableness of the school's procedure on the particular facts of the case before it. The March 9, 1978, Memorandum, relying in considerable part on *People v. D*, is an evidently careful effort to furnish such assistance to school authorities as the nature of the situation affords. Simply because the situations presenting a question about the propriety of search are so insusceptible to advance definition and classification, any correct set of guidelines would be inevitably vague and, to the extent that they escaped vagueness, would have to be so endlessly qualified that they would be deprived of all practical usefulness. Again, any effort to render a decision along these lines would be to attempt an advisory opinion on instances not in actual controversy and not ready for adjudication.

The same answers must be given to plaintiffs' suggestion that there can be a partially summary decision on the question of student consent, parental notice, mass searches and body searches.

3. From what has already been said it necessarily follows that the present case is not the one which can be maintained as a class action. The central difficulties are that, *first*, the high school students who have been and may hereafter be searched do not in any significant sense of the word present common issues of fact however·they might be sought to be classified, or questions of law that were common, and *second*, the claims of any selection of recently searched high school students could not in any useful sense be considered typical of other and of future high school students who considered themselves aggrieved by searches or who are apprehensive of search. The multitude of search and seizure cases reported in state and federal courts, and the difficulty and division that the decision of the search and seizure cases presents, unite to indicate that, as has been often said,

these are matters in which principle is evolved to the extent that it can be usefully evolved through case by case decision. Plaintiffs point to the decisions in *Tunin v. Ward*, S.D.N.Y.1977, 78 F.R.D. 59 (invalidity or maladministration of furlough release provisions of State Correction Law and Rules); *Diaz v. Ward*, S.D.N.Y.1977, 437 F.Supp. 678 (relieving parolees of allegedly unconstitutional searches pursuant to "consent" clause of parole contract); and *Cicero v. Olgiati*, S.D.N.Y.1976, 410 F.Supp. 1080 (invalidity against vagueness challenge of New York Correction Law § 213 providing for release of prisoners on parole). It is certainly at least possible that in these three cases specific decision of points in actual controversy may be made. *Tunin* involved an issue of discrimination by reason of race, and involved rules that might have been in conflict with the statute under which they were drafted, or with the constitution; in *Cicero* the validity of the statutory provision for release on parole was directly challenged, and the saving effect of rules drafted under the statute was before the court; and in *Diaz* there was at least the threshold question whether parolees had Fourth Amendment rights and if so whether the supposed waiver of them in the parole contract had any validity. The present case concerns what may best be thought of as the vast common law of search and seizure in one very complex and rapidly evolving area of its application. There is no doubt that student searches are matters of regular occurrence at least in Bayside and James Madison High Schools, and it may well be that detailed information about the search experience of all the schools in the City system or indeed in the State would reveal a variety of ways of dealing with the school problems that give rise to search occasions. Nothing, however, in the evidence thus far produced and referred to by counsel suggests that the search questions arising in the schools can be reduced to an ordered system through judicial intervention by declaratory judgment and injunction. What the evidence referred to does indicate, of course, is that much could be done administratively and by rule to systematize search procedures, and to create safeguards for teachers and students alike against unsupervised search decisions. The initiative, however, must be taken by the school systems and must not be imposed by essentially advisory judicial intervention.

It is accordingly,

ORDERED

1. That the motion of the defendants Amicone and Heitner to reinstate the verdict or in the alternative for a new trial or in the alternative to certify the questions involved to the United States Court of Appeals under 28 U.S.C. § 1292(b) is denied;

2. The motion of the plaintiffs for summary judgment on the issues set forth in plaintiffs' memorandum in support of motion for partial summary judgment filed October 23, 1978, is denied; and

3. Plaintiffs' motion for an order under Rule 23(c)(1) that the action be maintained as a class action is denied.